**Carmen WILLIAMS, Petitioner,**

**v.**

**Dorothy ARN, Supt., Respondent.**

**No. C85–500A.**

United States District Court, N.D. Ohio, E.D.

June 13, 1986.

See also, D.C., 654 F.Supp. 241.

Dean Carro, Appellate Review Office, School of Law, University of Akron, Akron, Ohio, for petitioner.

Christine Manuelian, Asst. Atty. Gen., Columbus, Ohio, for respondent.

## MEMORANDUM OPINION

DOWD, District Judge.

### PROCEDURAL HISTORY

The petitioner, Carmen Williams, aided by her counsel James Burdon, filed this action seeking *habeas corpus* relief pursuant to Title 28 United States Code § 2254 on February 12, 1984. The case was assigned to United States District Judge Sam H. Bell who referred the case to Magistrate Charles R. Laurie on February 12, 1985 for supervision and for the preparation of a report containing a recommended disposition. The Magistrate conducted an evidentiary hearing on May 29, 1985 and thereafter, on June 24, 1985, he filed a report and recommendation with Judge Bell recommending that petitioner's case be dismissed. On July 2, 1985, Judge Bell disqualified himself from further conduct on this case and this matter was assigned to this Court. On July 2, 1985, petitioner's counsel James L. Burdon filed a motion seeking to withdraw as attorney of record for the petitioner. On August 26, 1985, this Court denied Mr. Burdon's motion to withdraw as counsel of record and granted the petitioner until the 19th of September, 1985, to file objections to the report. On September 19, 1985, Mr. Burdon filed the objections of the petitioner to the report and recommendation. On October 21, 1985, J. Dean Carro entered an appearance as counsel for the petitioner, replacing Mr. Burdon who subsequently testified in an evidentiary hearing before the Court in support of one of petitioner's claims. The Court, after examining the report and recommendation of Magistrate Laurie, scheduled an oral hearing on November 11, 1985 for December 4, 1985. Counsel were directed to appear at the hearing and respond to the following questions:

1. What circumstances if any does the failure of the defendant's lawyer to communicate to the defendant a bona fide offer by the government to accept a plea of guilty to reduce charges constitute the denial of effective assistance of counsel.

2. Has the petitioner exhausted state remedies on the issues respecting the alleged communication of the offer to accept the plea of guilty to aggravated robbery in return for a promise to dismiss the aggravated murder charge.

3. Under what set of circumstances, if any, must a court conduct an evidentiary hearing in this case with respect to the issue of whether the alleged offer was communicated by Kirkwood (an assistant Summit County prosecuting attorney) to petitioner's trial counsel?

On December 20, 1985, the Court concluded that the petitioner had exhausted her state remedies, opined that a failure of defendant's attorney to communicate to the defendant a bona fide offer by the government to accept a plea of guilty to reduced charges constitutes the denial of effective assistance of counsel citing *United States ex rel Caruso v. Zelinsky*, 689 F.2d 435, 438 (3rd Cir.1982), and declared that, in the exercise of its discretion, and in order to discharge its duty to conduct a *de novo* review of the Magistrate's report would hold an evidentiary hearing to review the petitioner's allegation that her retained trial counsel's failure to inform her of the government's willingness to accept a guilty plea to reduce charges constituted ineffective assistance of counsel.

On February 12, 1986, an evidentiary hearing was conducted before the Court for a period of seven hours. Subsequently, a transcript of the evidentiary hearing and post-evidentiary hearing briefs were filed as requested by the Court.

A recital of the lengthy state proceedings are set forth in the Magistrate's report and recommendation from pages 2 through 7. The Magistrate's report and recommendation indicates that the jury returned a verdict of guilty on January 2, 1975.[1] Petitioner was one of four persons charged in the October, 1974 robbery and homicide of an Akron taxicab driver, Robert Hartley. The factual background for the petitioner's conviction is set forth by the Ohio Court of Appeals.

On the evening of October 16, 1974, Jeremiah Caldwell, Johnny Roper, Anita Small, and the defendant, Carmen Williams, left the defendant's home after planning to commit a robbery. They first walked to a bar in the neighborhood where they called a cab. In response to their call Robert Hartley picked them up in a G.I. cab, drove them to Crosby Street, and stopped. As the four were getting out, Johnny Roper pulled a pistol on Hartley and forced him to get out of the cab. The four robbers took nine dollars from him. They all got back in the cab and made Hartley drive them to Putnam Street. Hartley parked the cab and all the occupants got out. The four robbers rummaged through the cab and found the coin changer which they threw away. Hartley was then placed in the trunk and Johnny Roper drove the cab to Perkins Woods. The four robbers again got out of the cab. Johnny Roper and Anita Small took the driver out of the trunk and walked out into a field with him. The four shot him five times in the head and upper torso. These shots killed Hartley. The four then fled the scene on foot.

The defendant, Carmen Williams, was charged with aggravated murder, a violation of R.C. 2903.01(B) with two specifications. The specifications were under R.C. 2929.04(A)(2), (aggravated murder committed for the purpose of escaping detection, apprehension, trial or punishment for aggravated robbery) and R.C. 2929.04(A)(7) (aggravated murder committed while the defendant was committing aggravated robbery). She was also

---

**1.** The Court's review of the transcript indicates that the jury's verdict was returned on January 10, 1975. The trial commenced on January 2, 1975.

charged with aggravated robbery, a violation of R.C. 2911.01(A)(1) or (2).

In a pre-trial statement and later on the stand as a witness, the defendant claimed that she was unaware of any of the criminal intentions of her friends, got out of the cab as it went up the innerbelt, was not present during the robbery or murder, and took no part in either crime. The State's main evidence is the testimony of two of the four participants, Anita Small and Jeremiah Caldwell. The record also contains a considerable amount of supporting evidence.

A jury found the defendant guilty of both crimes and the two specifications. A mitigation hearing was held and on April 10, 1975, the trial court found that "the offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity." The defendant was sentenced to life imprisonment for the murder and 7 to 25 years for the robbery with the sentences to run consecutively.[2]

Magistrate's Report and Recommendation, pp. 8–9. The petitioner was found guilty of aggravated murder and two aggravating circumstances in violation of Ohio R.C. § 2903.01 as it was then constituted in 1974. As a consequence, following the petitioner's conviction, the trial court under then existing Ohio statutory law had the obligation to conduct a mitigation hearing and determine whether there was a mitigating circumstance that would save the petitioner from a death sentence. During the mitigation hearing, the trial court found the performance of petitioner's trial counsel to be such that petitioner was being denied the effective assistance of counsel and thus petitioner's retained trial counsel[3] was removed from further proceedings in the mitigation hearing.[4] Attorney James Burdon was appointed to represent the defendant during the mitigation hearing and as a consequence of the completed hearing, the trial court found a mitigating circumstance to exist and sentenced the petitioner to a life sentence.[5]

This case presents two issues. Each involves the petitioner's sixth amendment right to the effective assistance of counsel. The first issue relates to the petitioner's claim that her retained counsel denied her the effective assistance of counsel by both his pre-trial and trial performance as to the issue of her guilt or innocence. The second issue, independent of the issue of petitioner's counsel's trial performance, relates to the additional charge of a denial of the effective assistance of counsel because petitioner's trial counsel allegedly received prior to trial from the prosecuting attorney a proposed guilty plea agreement which was not communicated to the petitioner. The alleged proposal called for the petitioner's plea of guilty to the charge of aggravated robbery in return for a *nolle* of the aggravated murder charge.

2. As indicated by the Court of Appeals, the testimony of two of the four participants, Anita Small and Jeremiah Caldwell, both implicated the petitioner in the killing of Hartley. Anita Small, who had already been convicted of the slaying of Hartley, indicated that she fired shots into the body Hartley, and that thereafter the petitioner did likewise. Jeremiah Caldwell disagreed. He contended that Anita Small and Johnny Roper walked the taxicab driver away from the cab and that the two of them fired the fatal shots while Caldwell and the petitioner remained in the vicinity of the cab and then ran after the shots were fired.

3. In a subsequent state post-conviction proceeding, the state trial court made an express finding that the removal for the ineffective assistance of counsel during the mitigation proceeding was not to be construed as finding that the trial performance of petitioner's counsel was likewise ineffective.

4. The Supreme Court of the United States subsequently determined that Ohio R.C. § 2903.01 as it related to the determination of whether a death penalty should be imposed was unconstitutional. Ohio R.C. § 2903.01 was amended effective October 19, 1981. As before, where a defendant is convicted of aggravated murder and of an aggravating circumstance, a bifurcated hearing is conducted but the jury makes the initial recommendation as to the sentence rather than the trial judge acting alone as in this case.

5. The direct appeal from plaintiff's conviction and sentence for aggravated murder was prosecuted by the petitioner's retained trial counsel.

## INEFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL PROCEEDINGS

The petitioner was represented by a retained counsel secured by her family. The petitioner was 18 years of age at the time of the offense. Her family hired Gerald Smith of Avon Lake to represent the petitioner. Alex Jesensky was associated with Gerald Smith in the practice of law. Smith referred the case to Jesensky and eventually Jesensky was the only person to participate in the trial as defense counsel for the petitioner. Jesensky had not previously participated as a defense counsel in a felony jury trial.

Petitioner alleges that Jesensky provided ineffective assistance of counsel prior to and during the trial in the following particulars:

1. Jesensky failed to file a motion to suppress the petitioner's pre-trial statement.

2. Jesensky failed to file a notice of alibi.[6]

3. Jesensky introduced the petitioner's juvenile arrest record while conducting the direct examination of the petitioner during the presentation of her defense.

4. Jesensky failed to engage in any substantive cross-examination of Anita Small and Jeremiah Caldwell.

Mindful of the mandate in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) that a successful challenge to one's conviction based upon an allegation of the denial of effective assistance of counsel requires a showing that the defendant's counsel's performance was deficient and that the deficient performance prejudiced the defendant, Magistrate Laurie found, consistent with the first step of the two-step test mandated by *Strickland v. Washington, supra*, that the only ineffective assistance of counsel claim established related to Jesensky's questioning of the petitioner in which he had her relate her juvenile arrest record while testifying in her own defense.[7]

---

**6.** The defendant testified in her own behalf and claimed that she was elsewhere at the time of the robbery and homicide, but no notice of alibi was filed. No other witness was called by the defendant to support the alibi. The trial court expressed concern over the absence of a pre-trial notice of alibi (R. 279–280) as required by Rule 12.1 of the Ohio Rules of Criminal Procedure, but the prosecution entered no objection. However, the trial court did not charge on the defense of alibi nor did petitioner's counsel object to the absence of an alibi instruction.

**7.** Under Jesensky's questioning, the petitioner testified as follows:

Q. Carmen, you have, I am sure it will be brought out, a record as a juvenile delinquent; is that correct?
A. Yes.
Q. You have been charged with shoplifting on two occasions?
A. Yes.
Q. You have been a run-away?
A. Yes.
Q. Did you run away from your home?
A. Uh—
Q. Is that correct?
A. No
Q. What do you mean? No, you are not a run-away from your home?
A. Well, I wasn't staying with my mother at the time.

Q. I see. You also have been a run-away on another occasion; also been charged with destruction of property; obscenity; disturbing the peace; petit larceny; abusing an officer; assault and battery; and soliciting; is that correct?
A. Yes, all but the last one.
Q. What I have indicated to you are charges, merely being arrested, not a final disposition. It's not a conviction but just an arrest, a charge; isn't that correct?
A. Yes.
TR. 249–50.

As indicated in Magistrate Laurie's lengthy and well researched report and recommendation,

Section 2151.358(H) of the Ohio Revised Code prevents the use of juvenile adjudications in another proceeding for purposes of general impeachment of the credibility of a witness. *E.g., State v. White,* 6 Ohio App.3d 1, 451 N.E.2d 533 (Cuyahoga Co.Ct.App.1982). Additionally, it is well settled that a witness may not be impeached using prior arrests for criminal conduct, only convictions are admissible for impeachment purposes. *E.g., Wagner v. State,* 115 Ohio St. 136, 152 N.E. 28 (1926); *State v. Cole,* 107 Ohio App. 444, 155 N.E.2d 507 (Hamilton Co.Ct.App.1958). Thus, the prosecution could not have used Petitioner's juvenile arrests or convictions for general impeachment purposes.

However, the Magistrate found that the petitioner had failed to establish the second step in the *Strickland v. Washington* analysis, *i.e.*, that there was a reasonable probability but for counsel's unprofessional error, that the result of the proceeding would have been different.

The Magistrate found that, contrary to Kirkwood's assertion, and consistent with Jesensky's testimony, that there had been no pre-trial offer by the prosecution to accept a plea of guilty to aggravated robbery in return for an agreement to dismiss the aggravated murder charge. The Magistrate concluded that there having been no offer, then of course, there could be no ineffective assistance of counsel with respect to that issue.

In the objections to the report and recommendation of the Magistrate, the petitioner challenged the Magistrate's findings with respect to the failure to move to suppress the pre-trial statement, the failure to file a notice of alibi, the conclusion reached by the Magistrate with respect to the petitioner's counsel's gratuitous introduction of the juvenile arrest record, and the Magistrate's finding with respect to the lack of a substantive cross-examination of Small and Caldwell. The petitioner's counsel opines that if Jesensky's performance during the mitigation hearing required his removal, how can it be said that Jesensky rendered adequate representation during the trial.

■ In order to assess the petitioner's complaints about the trial performance of her retained trial counsel against the pronouncements contained in *Strickland v. Washington, supra,* the Court has read the entire transcript of the petitioner's trial as a part of its *de novo* review. From a review of the transcript of the trial in state court, the Court finds as follows:

1. By the time Gerald Smith and Alex Jesensky were retained to represent the petitioner, the course and nature of her defense had, for all practical purposes, been fixed by the petitioner's exculpatory statement given to the assistant Summit County Prosecuting Attorney Harold Stubbs in which she denied involvement in the robbery and homicide and claimed an alibi for the time in question.[8] In substance, Williams told Harold Stubbs, Assistant Summit County Prosecuting Attorney, that she had started on the taxicab drive with the co-defendants Roper, Small, and Caldwell, but that after the cab had driven several blocks, she asked the cab driver to stop, withdrew from the cab, and in no way participated in the subsequent robbery and homicide.

2. During the course of the trial proceedings, Jesensky did not file a motion to suppress the petitioner's pre-trial statement to Stubbs.

3. Jesensky did not file a notice of alibi.

4. Jesensky did introduce the petitioner's juvenile arrest record while she was on the stand testifying in support of her claim that she had left the taxicab prior to the robbery and the homicide.

5. Jesensky's cross-examination of Small and Caldwell was limited as claimed. (The cross-examinations of Jeremiah Caldwell and Anita Small are attached as appendices 1 and 2.) The direct examinations, as to the details of the killing, were brief.[9]

---

8. The prosecution introduced the petitioner's exculpatory statement as a part of the government's case in chief by playing for the jury a cassette recording of the petitioner's interview with Stubbs. (R–160) Then the prosecution introduced the testimony of Belinda Jo Sibley and Fred Pennick (R–169–200) who contradicted the petitioner's claim that she spent the evening of the homicide at her sister Anna's apartment.

9. Caldwell's description on direct examination of the shooting was limited to the following questions and answers:

Q Everybody got out of the car. What's the next thing that happened, Jeremiah?
A Well, Johnny and Anita took the cab driver out the trunk and walked him away from the cab.
Q On the road or on the grassy or ground area?
A Towards the trees.
Q Towards the trees. What happened then?
A Well, I heard gunshots.
Q Where were you at?
A On the right-hand side of the cab.
Q Where was Carmen Williams at?

It is noteworthy that Jesensky was uncertain whether he had attended the trial of Anita Small during which she testified [10] as he had no recollection of her trial. (E.H. 221–224) Obvious contradictions exist in the testimony of Caldwell and Small regarding the details of the Hartley killing, but there was no cross-examination of either Caldwell or Small as to the substantive details contained in their direct examination.[11]

A Beside me.
Q See any fire from a gun?
A Yes, sir.
Q How many shots did you hear fired the first time?
A First time?
Q Yes, sir.
A Two.
Q Did you see who fired those shots?
A Yes, sir.
Q Who was that?
A Nita Small.
Q Who fired the other shots?
A Johnny.
Q How many shots did Johnny fire?
A Three.
TR. 83–84.

Small's description on direct examination of the shooting was also brief and limited to the following questions and answers:
Q What happened then?
A That's when they told him to go over there and lay down.
Q Who had the gun at this time?
A Johnny.
Q Did the cab driver walk over and lay down?
A Yes.
Q Who walked along?
A All of us.
Q The cab driver's laying there on the ground, and the four of you are standing there. What happened next?
A That was when Johnny told me I had to shoot.
Q Did he give you the gun?
A Yes.
Q Did you shoot the cab driver, Nita?
A Yes.
Q Did you fire a second shot at the cab driver, Nita?
A Yes.
Q What did you do after you fired the second shot?
A Johnny took the gun and shot.
Q What did Johnny do after he shot the cab driver?
A He gave it to Carmen.
Q What did Carmen do?

## CHOICES CONFRONTING PETITIONER'S RETAINED COUNSEL RESPECTING HER DEFENSE

The prosecution's case against the petitioner was uncomplicated and direct. The prosecution demonstrated that four persons had accepted the taxicab drive with Hartley and that his body was subsequently found with five bullet wounds and his money changer missing as well as any cash that he might have been missing. Two of the four passengers in Hartley's cab testified. The third passenger, the petitioner,

A She shot.
Q What did Carmen do after she shot?
A She gave it to Jeremiah.
Q What did you do then?
A Started to run.
Q What did Carmen do?
A Started running.
Q Which way did you run?
A Through a back yard over a fence.
Q Were you running together, the two of you?
A Yes.
Q While you were running, did you hear any more shots?
A Yes.
Q How many?
A One.
TR. 118–19.

**10.** Judge John J. Reece of the Summit County Common Pleas Court presided over the jury trials of Small and Williams and sat on the three-judge panel that heard the case of Johnny Roper. Judge Reece testified that Anita Small testified in her own defense and admitted she fired the gun but claimed that she did so under duress as Johnny Roper made her do it and told her if she didn't shoot the cab driver he would shoot her. (E.H. 129–130) The record in the petitioner's case clearly indicates that Anita Small had been tried and convicted before she testified against the petitioner.

**11.** *Strickland v. Washington, supra,* grants great latitude to defense counsel in the choice of strategies employed by defense counsel. While the absence of any cross-examination of either Small or Caldwell as to the details of the killing and the obvious differences in their accounts seems questionable on hindsight, defense counsel may have reasonably concluded that such a meager cross-examination was the best tactic in view of the decision to rely upon an alibi defense. The transcript of the trial does not include final argument so the Court can only speculate on how petitioner's trial counsel argued with respect to the testimonies of Caldwell and Small.

denied her presence, relying on her claim that she had left the cab after the ride began and had gone to her sister's home. However, the petitioner's testimony of non-involvement was seriously challenged by the testimony of several other persons who stated they heard post-homicide conversations in which the petitioner was participating that implicated the petitioner in the robbery and slaying. By the time petitioner's retained counsel entered the case, the petitioner had already set the nature of the defense with her exculpatory statement of October 18, 1984 to Stubbs claiming noninvolvement and alibi.

■ The choices or strategies open to retained counsel were very narrow. The first was to advance the petitioner's claim by placing her on the stand to challenge the credibility of Small and Caldwell. This was the strategy adopted by defense counsel. An alternative strategy might have been to attack and to attempt to keep from the jury the pre-trial statement. However, it appears that such an effort would have been difficult given the exculpatory nature of the pre-trial statement to Stubbs. Another alternative strategy would have been for the defendant to have repudiated her pre-trial statement and claimed that while she was present at the homicide, she neither participated in nor encouraged it, relying in effect, upon the testimony of Caldwell that she did not participate in the shooting. Such a strategy would have necessitated Jesensky persuading the petitioner to abandon her pre-trial statement. The Court finds no authority for the proposition that the duty to effectively represent a client includes the duty of convincing a client that a prior statement is so untrustworthy that the likelihood that it will be believed is minimal. It is difficult to imagine the scenario whereby a different strategy at trial would have produced a contrary result in the face of the strong case presented by the prosecution as to the petitioner's direct involvement in the robbery and homicide coupled with the petitioner's uncounseled decision to advance an alibi defense. The Court finds that the trial performance of Jesensky is readily open to the challenge that it was deficient in the

context of the first step in the *Strickland v. Washington* analysis, because of the failure to at least test, by a pre-trial motion to suppress, the voluntariness of petitioner's statement, the failure to file a notice of alibi, the gratuitous introduction of the defendant's juvenile criminal record, and the decision not to exploit the substantive contradictions in the testimony of Caldwell and Small. However, despite these alleged deficiencies, the Court finds no reasonable indication that a different result would have been achieved with a higher standard of performance by petitioner's retained counsel. In sum, to the extent Jesensky's trial performance was deficient, the Court finds that the performance did not prejudice the defendant with respect to the outcome of the trial.

## THE CLAIM THAT THE PROSECUTION OFFERED A GUILTY PLEA AGREEMENT TO REDUCED CHARGES

The petitioner claims that she was denied the effective assistance of counsel because Charles Kirkwood, one of the assistant prosecuting attorneys assigned to the prosecution of the Hartley murder defendants, presented Jesensky with a proposal whereby the prosecution would *nolle* the homicide charge in return for the petitioner's plea of guilty to aggravated robbery. She further contends that had she been advised of the proposal, she would have accepted it. Petitioner contends that the noncommunication of the offer constituted a denial of the effective assistance of counsel and a writ should issue on this aspect of her claim, irrespective of the disposition of the claim that her counsel was ineffective in his trial performance.

The controversy with respect to the proposed plea offer is unique. In short, Kirkwood, the prosecutor, testified that he made the offer and Jesensky, the retained defense counsel, denies that any such offer was made. The Magistrate conducted an evidentiary hearing and after weighing all the testimony, found that no plea offer was made by Kirkwood to Jesensky. The petitioner, in objecting to the Magistrate's report and recommendation, raised strenuous objections to that finding. As previously

indicated, the Court concluded that it should conduct an evidentiary hearing to enable it to better weigh the credibility of the key witnesses, Kirkwood and Jesensky, as to the apparently critical factual dispute.

In sum, Kirkwood testified that he was assigned the responsibility of getting the Williams case ready for trial. Kirkwood indicated that he had recently tried a case against Gerald Smith and found him to be a very effective advocate and against that background concluded that the prosecution of Williams would be difficult in view of the conflicting anticipated testimonies of Caldwell and Small concerning the shooting of Hartley.[12] Thus, Kirkwood decided to make the offer of a *nolle* of the homicide charge in return for a plea to aggravated robbery. Kirkwood testified that he made the offer to Jesensky by phone about the middle of December in 1974 and requested a reply at least a week before trial. (E.H. 10–11) Kirkwood further testified that he heard no response from Jesensky and assumed the offer had been rejected. On the morning of the trial, Kirkwood stated that Jesensky approached him and inquired whether the offer was still open to which Kirkwood replied "you never got back to me." Kirkwood indicated that Jesensky then replied that he "didn't have a chance to talk to his client yet." Kirkwood then consulted with John Shoemaker, the other assistant prosecuting attorney assigned to the Williams case, and Akron Police Detective Gandee, who was assigned the case and, after a brief discussion lasting no more than 45 seconds, found that none of the three were prepared to go forward with the earlier proposed plea agreement. Jesensky was advised accordingly and the trial began. (E.H. 16–17)

Jesensky denied that either conversation as claimed by Kirkwood on the subject of a plea agreement had taken place and contended that had such an offer been made, he would have advised Gerald Smith and the petitioner. Jesensky also testified that he had discussed the possibility of an offer to plead guilty to lesser offenses with the petitioner and she had replied "why should I plead to anything. I'm innocent. I wasn't there and I didn't do this thing." (E.H. 191–193)

---

**12.** Kirkwood explained his reasoning in detail as he testified:

A. Carmen, when she talked to the Police, indicated—I believe she had left the Roxy Cafe—never got into the cab. Went to her sister's house, and the fact that it proved to be an alibi defense and Jeremiah Caldwell's testimony and statement was that, after the robbery took place and after they took the cab driver to Perkins Park, why the four of them, himself, Anita Small, Carmen Williams and Johnny Roper, got out of the cab with the cab driver, whose name was Hartley.

Jeremiah's statement and testimony was going to be that he and Carmen ran away before the murder took place, and, therefore, my evaluation was that it was entirely possible that one could get a directed verdict on the murder charge, the aggravated murder charge, while the robbery charge could go to the jury on the testimony of Jeremiah Caldwell.

So what I did then was, I got Anita Small up out of the jail. Anita Small had been tried a month earlier, Your Honor, with Mr. Stubbs and Mr. Roper.

The jury has found her guilty of aggravated murder, but not guilty of the specifications, and guilty of aggravated robbery, so she was sitting in jail awaiting sentence.

So I got Anita up and talked to her every day, figuring, if we had any chance of going to trial, we would need another accomplice, since there were no other witnesses and no circumstantial evidence.

We needed a—I talked to her every day. I had nothing to offer her in terms of a plea bargaining for her testimony, and just tried to convince her that maybe she ought to tell the truth.

Anita's story was that all four of the Defendants had participated in the shooting, and that the gun had been passed around, and it was, in fact, a ritualistic-type murder.

Q. Were there any other pieces of evidence that you evaluated?

A. Well, as always, you look at the ability of opposing counsel to try the case. My opinion of Mr. Smith that I had in the trial a month before, he was one of five or six attorneys I had ever tried a case against, and I assumed that he was going to come in and try, as my prior testimony indicates—it was my opinion that by the time Mr. Smith was going to get through with two accomplices who told diametrically opposed stories on behalf of the State, there might not be a puddle left on the floor.

Those were the factors that led me to give the offer.

E.H. 12–14.

Considerable testimony was offered to assist the trier of fact in determining whether Kirkwood or Jesensky's testimony was the more credible.[13]

Additionally, the petitioner testified and claimed that had the noncommunicated offer to accept a guilty plea to aggravated robbery been communicated in return for a *nolle* of the aggravated murder charge, she would have accepted the offer.

Kirkwood was questioned about his authority as an assistant prosecuting attorney to have made the alleged offer without the approval of the Summit County Prosecuting Attorney Stephen Gabalac. Kirkwood indicated a belief that he had the authority to make such an offer but conceded that had the offer been accepted, he would have then sought approval of the offer from Shoemaker.

## FACT FINDINGS AS TO THE ALLEGED PLEA AGREEMENT OFFER

With respect to the fact dispute respecting the alleged communication of the reduced plea offer, the Court finds, after weighing the credibility of the witnesses and in particular the witnesses Kirkwood and Jesensky that:

1. Charles Kirkwood, Assistant Summit County Prosecuting Attorney, did, during the middle of December, 1974, in a telephone conversation with Alex Jesensky propose a guilty plea agreement with the petitioner by which, in return for the petitioner's plea of guilty to aggravated robbery, the aggravated murder charges would be *nolled.*

2. Mr. Kirkwood's proposed guilty plea agreement was conditional in the sense that Kirkwood needed to subsequently obtain the approval of John Shoemaker, the other assistant prosecutor assigned to the case.[14]

3. Mr. Kirkwood, in making the proposed plea agreement, did not indicate that the offer was conditioned upon a subsequent approval by Shoemaker.

4. Jesensky did not communicate to the petitioner the proposed plea agreement prior to January 2, 1975, the date petitioner's trial was to begin.

5. The proposed plea agreement was expressly withdrawn by Kirkwood on January 2, 1985 before petitioner's trial began.

## EFFECT OF FAILURE TO COMMUNICATE A PROPOSED PLEA AGREEMENT WHICH WAS IN FACT A CONDITIONAL PROPOSAL

A number of state courts have concluded that the failure of a defendant's counsel to

---

**13.** The petitioner offered the testimony of James Burdon who stated that Kirkwood told him of the offer after Burdon was assigned by the trial judge to represent the petitioner at the mitigation hearing. The respondent offered the testimony of Kirkwood's associate John Shoemaker, who participated along with Kirkwood in the trial of the petitioner as the prosecutors and who testified that he had no recollection of the discussion about a possible plea on the day of the trial. Smith testified that he did not hear about any plea suggestion from Jesensky. The trial judge, Judge John Reece, testified that it was policy that he be kept advised of any plea discussions and he was not advised of the plea offer by Kirkwood. Kirkwood acknowledged that he did not tell Judge Reece of the plea offer, but indicated that he was not aware of Judge Reece's policy in any event.

**14.** The following questioning of Kirkwood on the subject of approval of the proposed plea agreement was conducted by the Court:

THE COURT: I gather at the time—do you recall that you made the offer to Petitioner's trial counsel to drop the aggravated murder in return for a plea to aggravated robbery, there was no written or unwritten rule that you had to get the concurrence of your, the other Prosecutor assigned to the case?

THE WITNESS: Nothing formal. I knew eventually I'd have to get Shoemaker on it, but not at that time.

THE COURT: That leads to another question.

If, in fact, counsel for the Petitioner—how do you pronounce his name?

THE WITNESS: Jesensky.

THE COURT: If Jesensky had called back the next day and I talked to my client, and we accepted, now, are you bound or do you still have to get Shoemaker to agree?

THE WITNESS: That, I don't know.

Rightly or wrongly, I only had confidence in my ability to sell it.

E.H. 29–30.

communicate an offer of the prosecutor to accept a plea to reduced charges equates with the denial of the effective assistance of counsel. *See, Rasmussen v. Arkansas,* 280 Ark. 472, 658 S.W.2d 867 (1983); *Elmore v. Arkansas,* 285 Ark. 42, 684 S.W.2d 263 (1985); *Illinois v. Saunders,* 135 Ill. App.3d 594, 90 Ill.Dec. 378, 482 N.E.2d 85 (1985); *Illinois v. Whitfield,* 40 Ill.2d 308, 239 N.E.2d 850 (1968); *Lyles v. Indiana,* 178 Ind.App. 398, 382 N.E.2d 991 (1978); *North Carolina v. Simmons,* 65 N.C.App. 294, 309 S.E.2d 493 (1983); *Hanzelka v. Texas,* 682 S.W.2d 385 (Tex.Ct.App.1984); *Tucker v. Holland,* 327 S.E.2d 388 (W.Va. 1985). The decision of the Court of Appeals in the Third Circuit in *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3rd Cir.1982), reached the same conclusion.

Many of the state decisions cite *Lyles, supra,* as a basis for the determination that the failure to communicate the plea bargain constitutes ineffective assistance of counsel. In *Lyles,* the Court of Appeals of Indiana cited the A.B.A. standards, The Defense Function § 6.2(a) which states:

> (a) In conducting discussions with the prosecutor the lawyer should keep the accused advised of developments at all times and *all proposals made by the prosecutor should be communicated promptly to the accused.* (emphasis added).

The commentary to this section explains:

> Because plea discussions are usually held without the accused being present, there is a duty on the lawyer to communicate fully to his client the substance of the discussions. It is important that the accused be informed of proposals made by the prosecutor; *the accused, not the lawyer, has the right to pass on prosecution proposals,* even when a proposal is one which the lawyer would not approved. If the accused's choice on the question of a guilty plea is to be an informed one, he must act with full awareness of his alternatives, including any that arise from proposals made by the prosecutor. (emphasis added).

The *Lyles* court concluded that the defendant was denied the effective assistance of counsel at the critical stage of the proceedings when, on the day of trial, his counsel was informed that the defendant had the opportunity to plead to an offense with a recommendation of a one to five year sentence, but failed to so advise the defendant who was subsequently convicted and sentenced to ten years. The defendant's conviction was reversed and remanded with the following instructions:

> [W]e are constrained to reverse the judgment of the trial court and remand with instructions to conduct a guilty plea hearing, assuming, as equity indicates under the limited facts of this case, the State's offer continues.... However, should the State withdraw its offer to permit Lyles to plead guilty to the crime of theft, or should the trial court, in its informed discretion, refuse to accept the guilty plea if offered, Lyles is to be granted a new trial.

The issue of the appropriate remedy in those cases where the defense counsel failed to inform its client of a proposed plea agreement has not attracted extensive discussion. In *Simmons, supra; Whitfield, supra; Hanzelka, supra,* the convictions were reversed and the case remanded for new trial without any extensive discussion as to why that remedy was ordered. In *Zelinsky, supra,* the Third Circuit's discussion of remedy was limited to observing that a subsequent fair trial does not remedy the deprivation occasioned by the defense counsel's failure to communicate the plea offer to the defendant and then suggested a comparison with *Rose v. Mitchell,* 443 U.S. 545, 557–64, 99 S.Ct. 2993, 3000–04, 61 L.Ed.2d 739 (1979). In *Rose v. Mitchell* a sharply divided Supreme Court granted a habeas corpus petitioner a new trial in a homicide case where it was determined that the grand jury which indicted the petitioner had been selected in a fashion that discriminated against blacks.

The remedy of granting the defendant a new trial or, as in *Lyles,* permitting him to enter a guilty plea on the basis of

the uncommunicated offer because the defendant's counsel failed to communicate an opportunity to plead to a lesser offense and obtain a lesser sentence, is an anomoly where the defendant is subsequently convicted in a fair trial of the greater charge. The Court is unable to find any case in which the Ohio courts, the Court of Appeals for the Sixth Circuit, or the United States Supreme Court has endorsed such a remedy, as has the Third Circuit and the states of Indiana, Illinois, Arkansas, Texas, North Carolina, and West Virginia.

Against that background, the facts in this case as found by the Court bear further scrutiny in the context of relief, if any, to be accorded the defendant for the failure of her retained counsel to communicate the proposed plea opportunity prior to the time that the plea proposal was withdrawn. The defendant had offered a pre-trial statement which denied culpability in either the robbery or the homicide. The prosecution's proposed reduced plea offer was conditioned upon further approval. The proposal of Kirkwood was really nothing more than "would your client be interested in a plea of guilty to robbery if the government were to drop the homicide charge." Finally, the offer was withdrawn before the trial commenced.

■ The Court concludes that the failure of Jesensky to advise the petitioner of the guilty plea proposal constitutes the denial of the effective assistance of counsel. However, under the peculiar circumstances of this case as outlined and with particular emphasis on the fact that the plea proposal was conditional and was withdrawn before the trial commenced, the Court declines to order as a remedy a new trial on the aggravated murder charge. The imposition of such a remedy, based on the facts as found by the Court, would chill if not completely inhibit guilty plea discussions that traditionally are carried on in an informal setting, much as conducted in this case. In this case, unlike *Rose v. Mitchell, supra,* upon which the Third Circuit apparently relies for its endorsement of the possible remedy of a new trial in *Zelinsky, supra,*

no misconduct by the government is involved unless one postulates that a plea offer cannot be withdrawn until the prosecution is informed that the offer has been communicated to the defendant and rejected. Moreover, the public confidence in the justice system would be undermined upon the judicial determination that an uncommunicated plea offer to the defendant by her own defense counsel, even where withdrawn prior to trial by the prosecution, entitles the defendant to either the opportunity to plead guilty based on the withdrawn offer or alternatively a new trial even though no error in the original conviction exists. *Cf. Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984).

The Court has also considered whether a new trial should be ordered because of the combination of the deficient trial performance by petitioner's counsel and the petitioner's trial counsel's failure to communicate the proposed reduced plea agreement. The Court is mindful of the argument, although not enunciated in this case, that the combined performance of petitioner's inexperienced trial counsel is so far below minimum standards that the only appropriate remedy is to grant the writ as to petitioner's conviction for aggravated murder and order the petitioner be released from confinement as to that conviction unless retried within a stipulated period of time. In the Court's view, such an order would be contrary to the principles enunciated in *Strickland v. Washington, supra,* and the Court thus declines to so order.

For all of the foregoing reasons, the recommendation of the Magistrate that the writ be dismissed is approved. Writ dismissed.

IT IS SO ORDERED.

### APPENDIX 1

Q  Do you have any hobbies or anything like that?

A  Yes, sir.

Q  What's that?

A  Sewing

Q What do you make?

A My clothes.

Q Did you make any of the things that you have on?

A Yes, sir.

Q What's that?

A My outfit.

Q Jeremiah, just one last question I'm going to ask you. Is what you have told me, and told this Jury, these twelve people over here, true?

A Yes, sir.

MR. SHOEMAKER: No further questions of this witness at this point.

THE COURT: All right. You may cross-examine.

CROSS–EXAMINATION

BY MR. JESENSKY:

Q Jeremiah, can you hear me?

A Yes, sir.

Q You don't have to say "yes, sir" to me. Just answer the question. If it takes a yes, answer yes. Okay?

A Yes, sir.

Q Jeremiah, at the very beginning Judge Reece asked whether or not you were here of your own free choice, and I believe you have indicated that you are, and also your attorney discussed this with you, and you are here again today of your own free will; is that correct?

A Yes, sir.

Q All of these answers are freely given to Mr. Shoemaker's questions; is that correct?

A Yes, sir.

Q Without threat? Without a threat?

A Yes, sir.

Q Without any promises—

A Yes, sir.

Q —as to the future?

A Yes, sir.

Q I believe that you have already answered that that gun, the Exhibit that has been placed on it, the number, it is your gun; is that correct?

A It's not mine, but I had it.

Q On or about October 16th, 17th, that was your gun?

A Yes, sir.

Q Is that correct?

A Yes, sir.

Q You have indicated that you obtained that gun from an armed robbery; is that correct?

A Yes, sir.

Q Now, you have indicated that you lied in the past; is that correct?

A Yes, sir.

Q You have lied to Mr. Stubbs?

A Yes, sir.

Q Number one Assistant Prosecutor of Summit County; is that correct?

A Yes, sir.

Q Do you know Mr. Stubbs?

A Do I know him?

Q Yes. Is he in the courtroom now?

A No, sir.

Q Might he be behind you in that other adjoining room?

A No, sir.

Q You did lie to Mr. Stubbs; is that correct?

A Yes, sir.

Q Even though Mr. Stubbs had indicated to you who he was when he first talked to you back in October 18th of 1974; is that correct?

A Yes, sir.

Q You lied to him at that time in response to a question that, "Before we went to Crosby Street, we went up Howard and let out Johnny's sister, Carmen, out on Howard Street. Then we turned on the Interbelt."

MR. SHOEMAKER: Which page are you on, Mr. Jesensky?

MR. JESENSKY: Page 4 of the lying statement, apparently which was lied to Mr. Stubbs, transcribed by Barbara A. Gable.

BY MR. JESENSKY:

Q Back on October 18th, 1974, that was one or two days after this incident; is that correct?

A Yes, sir.

Q Your memory as to the incidents at that time has to be sharper than today; is that correct?

A Yes, sir.

MR. SHOEMAKER: Object to the form of the question.

THE COURT: Well, overruled. It's cross-examination.

BY MR. JESENSKY:

Q In other words, two days after this incident you lied to Mr. Stubbs, you told him that Carmen got out at the Interbelt; is that correct?

A Yes, sir.

Q When your mind was fresh?

A Yes, sir.

Q And then subsequently, today, you have indicated that Carmen has been with this group of four at the time later at the robbery and this horrible murder?

A Yes, sir.

Q Have you told any other lies?

A Yes, sir.

Q Concerning this case?

A Since when?

Q Since the case began, which would be on or about October 16th or 17th of 1974?

A On the 18th, yes.

Q You have told other lies concerning this case; is that correct?

A Yes, sir.

Q At other times than October the 18th when you lied to Mr. Stubbs; is that correct?

A Not really.

Q You either have or you haven't. Can we have an answer? Have you lied on other occasions than to Mr. Stubbs on October 18th, 1974 concerning this case?

MR. SHOEMAKER: I'm going to have an objection to that. What's he talking about? What point of time?

THE COURT: Well, if he understands, he may answer.

Do you understand the question, Mr. Caldwell? The question is, other than your statement to Mr. Stubbs on the 18th of October, do you know if you have lied on any other occasion concerning the incidents of this case?

THE WITNESS: No, sir.

BY MR. JESENSKY:

Q Jeremiah, is your answer that you don't know if you have lied, or you know that you have not lied?

A Well, on the 18th I made a statement. I lied on that statement.

Q I'm asking have you lied concerning this case other than from October 18th up to today?

A It all depends in the period of time.

Q In other words, you're going to pick and choose what is a lie and what is not a lie between October 18th and today?

MR. SHOEMAKER: Objection.

THE COURT: Sustained. That's argumentative. Just put a question.

BY MR. JESENSKY:

Q You don't know if you have lied between last October 18, 1974 and today?

A Well, I never lied at court.

Q Mr. Stubbs wasn't in court on October 18th; is that correct?

A Yes, sir.

Q But you're telling the truth today, aren't you?

A Yes, sir.

Q You're not lying today like you have in the past?

A No, sir, I'm not lying.

Q You're not lying today?

A No, sir.

Q You're not lying today?

A No, sir.

MR. SHOEMAKER: I object to the form of the question.

THE COURT: I'll sustain the objection. It's repetitious.

MR. JESENSKY: I have nothing further.

THE COURT: All right. Redirect?

MR. SHOEMAKER: I have nothing further.

THE COURT: All right. You may step down, Mr. Caldwell.

.    .    .    .    .

(Thereupon, the witness was excused from the witness stand.)

.    .    .    .    .

THE COURT: Mr. Jesensky.

.    .    .    .    .

(Thereupon, a brief discussion was had at the bench between the Court and all Counsel, out of the hearing of the Jury and off the record.)

.    .    .    .    .

## APPENDIX 2

A No.

Q When's the first time you saw me, Carmen—Nita, I mean?

A About a week after my trial.

Q Did I tell you to tell the truth?

A Yes.

Q Did you tell the truth today?

A Yes.

Q Are you sure of that?

A Yes.

MR. KIRKWOOD: Okay. I have no further questions.

THE COURT: All right. You may cross-examine.

### CROSS–EXAMINATION

BY MR. JESENSKY:

Q Nita, your attorney is here again this morning; is that correct?

A Yes.

Q And as you indicated yesterday, you agreed to come here today to testify; is that correct?

A Yes.

Q You haven't changed your mind since yesterday?

A No.

Q And you are here today of your own free will under the same conditions and the same agreement, under the same thing as yesterday; is that correct?

A Yes.

Q Nobody's offered you any benefits?

A No.

Q Haven't promised you any consideration for coming in and testifying; is that correct?

A They haven't.

Q Do you understand what I mean when I say "consideration"?

A Yes.

Q So that I can understand that you understand it, what do you mean by consideration?

A Have anyone—

Q I can't hear you, Nita.

A Have anyone considered me being here, told me to come, something like that.

Q Well, do you think that your coming here is going to help you?

A No.

Q You honestly believe that?

A Yes.

Q You have lied to Mr. Stubbs, who is the Chief Assistant County Prosecutor of Summit County on the first occasion after your arrest; is that correct?

A Yes.

Q You lied to him?

A Yes.

Q You have also talked to Mr. Stubbs on other occasions; is that correct?

A Yes.

Q And there are other lies in the statements; is that not correct?

A Yes.

Q But you are here today, you are telling the truth today; aren't you?

A Yes.

Q Because today we are in court. Do you have an answer?

MR. KIRKWOOD: Objection. He didn't ask a question.

THE COURT: Well, did you pose a question?

MR. JESENSKY: Read it back, please.

THE COURT: First of all, ladies and gentlemen, I will instruct you to disregard the gesture of Defense Counsel in slamming the papers on the table.

MR. JESENSKY: I apologize to the Court and Jury.

THE COURT: Now, pose a question to the witness, and I'll instruct the witness to answer. Pose a question.

MR. JESENSKY: May it be read back, please?

THE COURT: All right.

.    .    .    .    .

(Thereupon, the last question was read by the Court Reporter.)

.    .    .    .    .

THE COURT: The question is, then, as I understand it, are you telling the truth today because you are in court; is that the question.

MR. JESENSKY: This is the question, your Honor.

THE COURT: All right. Do you understand the question, Miss Small?

THE WITNESS: I think so.

THE COURT: All right. Would you answer it, please.

THE WITNESS: I'm telling the truth because it's the truth.

BY MR. JESENSKY:

Q  You have been convicted in this courtroom for the murder and robbery of Robert Hartley; is that correct?

A  Yes.

Q  You have not yet been sentenced; is that correct?

A  No.

MR. JESENSKY: Thank you, Nita. I have nothing further.

THE COURT: Any redirect?

MR. KIRKWOOD: I have nothing further, your Honor.

THE COURT: You may step down, Miss Small.

.    .    .    .    .

(Thereupon, the witness was excused from the witness stand.)

.    .    .    .    .

THE COURT: Would you call another witness.

MR. KIRKWOOD: Yes, State calls Detective Sergeant Gandee.

SHERMAN HARRIS GANDEE, being first duly sworn, was examined and testified as follows:

THE COURT: Be seated.

### DIRECT EXAMINATION

BY MR. KIRKWOOD:

Q  Okay, please state your name.

A  Sherman Harris Gandee.

Q  What is your trade, occupation or profession?

A  Police Officer, City of Akron.

Q  How long you been with the Akron Police Department?