Lewis Greg BARENTINE, Petitioner,

v.

UNITED STATES of America, Respondent.

Nos. C–C–89–105–P, (C–CR–85–62).

United States District Court, W.D. North Carolina, Charlotte Division.

Jan. 9, 1990.

---

**1242**

Michael S. Scofield, Charlotte, N.C., for petitioner.

Max Cogburn, Asst. U.S. Atty., Asheville, N.C., for respondent.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on a Memorandum and Recommendation (hereinafter "M & R") filed by United States Magistrate Paul B. Taylor on December 7, 1989. The M & R is in response to Petitioner's Motion, filed on February 27, 1989, to Vacate, Set Aside, or Correct his sentence pursuant to 28 U.S.C. § 2255. Petitioner alleged that his attorney, Mr. Kenneth Gordon, failed to inform him of a favorable five year plea offer because of a conflict of interest—namely that Petitioner's attorney was maintaining a sexual relationship with Petitioner's fiancee (Ms. Leslie Ann Dowling) during the representation of Petitioner. An evidentiary hearing was held by the Magistrate on October 3, 1989. Petitioner filed a timely objection on December 15, 1989 to the Magistrate's recommendation denying the Motion to Vacate, Set Aside, or Correct his sentence.

Pursuant to 28 U.S.C. § 636, the Court is required to make a de novo determination of those portions of the M & R to which objection is made. Petitioner's main objection is that the Magistrate was incorrect in making the factual determination that Mr.

Gordon did in fact make Petitioner aware of the five-year plea offer and that Petitioner rejected the offer. Moreover, Petitioner objects to the M & R's conclusion that Petitioner was not deprived of his constitutional right of effective assistance of counsel, and that Mr. Gordon's adulterous affair with Ms. Dowling cannot be held responsible for Petitioner losing a favorable plea bargain opportunity. In making its de novo review of the objections, the Court has reviewed the entire record in this matter including the case file, the Petition and the memorandum of law, the M & R, Petitioner's Objections, and the lengthy transcript from the evidentiary hearing of October 3, 1989. In addition, the Court has studied the applicable law.

The Court's review of the facts and law in this matter leads it to conclude that the determination of this case depends on a single factual determination—whether Mr. Gordon informed Petitioner of a five-year plea offer.

The burden of proof on a petitioner in a habeas case is to show by convincing evidence that he suffered a substantial constitutional deprivation at his initial trial. *See Jarrett v. Headley,* 802 F.2d 34 (2d Cir. 1986); *Clayton v. Haynes,* 517 F.2d 577 (4th Cir.1975). Where a petitioner contends that he was deprived of effective assistance of counsel, he must meet a two prong test. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that the deficient performance prejudiced the defense. *Id.; see also Roach v. Martin,* 757 F.2d 1463, 1476 (4th Cir.), *cert. denied,* 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985).

■ According to Petitioner and the witnesses who testified on his behalf at the hearing, Mr. Gordon intentionally failed to inform Petitioner of a favorable five-year plea offer. Petitioner believes that Mr. Gordon's sexual relationship with Ms. Dowling motivated Mr. Gordon to withhold the plea offer information in hopes that Petitioner would go to trial, be convicted

and receive a substantial sentence. In fact, the scenario occurred and Petitioner received a 35–year sentence.

Case law is clear that if Mr. Gordon withheld the plea offer information that Petitioner would have been unconstitutionally deprived of effective assistance of counsel. *See* M & R at 18. However, after weighing the testimony of Petitioner and his witnesses against the testimony of Mr. Gordon and Assistant United States Attorney Max O. Cogburn, Jr., the Magistrate determined that it was more likely than not that Mr. Gordon had informed Petitioner of the plea offer and that Petitioner had rejected the offer. Therefore, under the first prong of *Strickland*—deficient performance of counsel—Petitioner failed to show ineffective assistance of counsel.

The Court agrees with the Magistrate's Findings of Fact. Although Petitioner came forward with some evidence, the Court does not find that the testimony of Petitioner and his interested witnesses was *convincing* evidence. The Court concurs with the Magistrate that Mr. Gordon had over 50 conversations about a plea offer with the Assistant United States Attorney. It is simply not believable that if Mr. Gordon's intent was to subject Petitioner to a lengthy sentence that he would have continued negotiating throughout the pendency of the trial for an acceptable plea. Moreover, the trial transcript indicates Mr. Gordon made an excellent argument during the trial to have plea negotiations reopened when new evidence was discovered—conduct inconsistent with Petitioner's allegation that Mr. Gordon was attempting to bring the case for trial. Finally, Petitioner does not attack the performance of Mr. Gordon during the trial. Accordingly, Mr. Cogburn testified at the October 3, 1989 evidentiary hearing and the trial transcript confirms that Mr. Gordon did an excellent job of representing Petitioner at the trial. Therefore, the Court finds the assertion meritless that Mr. Gordon was attempting to assist the Government in securing Petitioner's conviction and a lengthy sentence.

Additionally, the Court believes Petitioner's own conduct in making these particular allegations at such a late hour casts doubt on the credibility of Petitioner's testimony. When this Court re-opened plea negotiations, Petitioner did not state that he believed his attorney was being less than forthright in the plea bargaining process. Petitioner attributes his failure to make such a statement to his inexperience with the legal system. However, Petitioner also testified that he did not trust Mr. Gordon during this entire time. Therefore, Petitioner also testified that during the trial that he frequently consulted with his co-defendants and "jail house" lawyers. Despite these efforts, Petitioner failed to notify the Court that he was being "set-up" by Mr. Gordon. Moreover, the Court has read the well-reasoned memorandum of law prepared by Petitioner and believes that Petitioner's claim that he was naive is without merit. The Court believes Petitioner would have notified the Court during the trial had he been unsatisfied with Mr. Gordon's representation.

Petitioner also testified that he became aware that Mr. Gordon withheld the plea offer shortly after being sentenced. However, Petitioner failed to raise this issue during his appeal despite being represented by new counsel. Furthermore, Petitioner did not argue that his sentence was illegal based on Mr. Gordon's failure to bring the plea offer to his attention when he filed his Rule 35 Motion.

In short, the Court agrees with the Magistrate that despite the despicable conduct of Mr. Gordon, Petitioner received adequate legal representation. Although Mr. Gordon readily admits to an adulterous affair with Ms. Dowling, the Court believes that Mr. Gordon presented the five-year plea agreement to Petitioner and that it was rejected. Only after being faced with an unsuspected thirty-five year sentence did Petitioner object to Mr. Gordon's conduct.

The Magistrate also recommended that the Court bar Mr. Gordon from future appearances before this Court for his unethical behavior. The Court considers Mr.

Gordon's conduct to be inexcusable and a stain on the entire legal profession. No attorney should sacrifice his integrity and the reputation of the bar for such shallow gratification. Therefore, the Court adopts the Magistrate's recommendation and will order Mr. Gordon to never appear before this Court again. Moreover, the Court will forward a copy of this Order and the M & R to the Bar Counsel for the State of Georgia. The Court encourages the Bar Association to conduct an investigation of Mr. Gordon's sexual affair with a client's fiancee.

NOW, THEREFORE, IT IS ORDERED that Petitioner's Motion to Vacate, Set Aside, or Correct his sentence under 28 U.S.C. § 2255 be, and hereby is, DENIED. The M & R is AFFIRMED and ADOPTED in its entirety. This action is hereby DISMISSED with prejudice.

IT IS FURTHER ORDERED that Mr. Kenneth Gordon be BARRED from making any future appearances before this Court.

## MEMORANDUM AND RECOMMENDATION

PAUL B. TAYLOR, United States Magistrate.

THIS MATTER is before the undersigned Magistrate on reference from the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) to consider a motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255 filed by Petitioner, Lewis Greg Barentine. In support of this motion, Petitioner alleges that he was denied effective assistance of counsel when his attorney failed to inform him of a favorable plea agreement offer by the government which would have limited his exposure to a five year term of imprisonment. Petitioner further alleges that his attorney's failure to inform him of the favorable plea offer was the result of a conflict of interest caused by his attorney developing and maintaining, throughout his representation of Petitioner in this case, a sexual relationship with Petitioner's fiancée, Ms. Leslie Ann Dowling.

After a jury trial during the October 15, 1985 term of court, Petitioner was convicted on conspiracy, possession, and distribution charges with regard to more than one thousand pounds of marijuana and more than two million methaqualone tablets. Subsequent to this conviction, Petitioner was sentenced to thirty-five years imprisonment and a two year special parole term. On direct appeal, the Fourth Circuit found no error and affirmed Petitioner's conviction in an unpublished decision filed September 4, 1987. Thereafter, Petitioner filed a Rule 35 Motion for reduction of sentence which was subsequently denied on July 11, 1988.

On October 3, 1989, the undersigned conducted an evidentiary hearing on the § 2255 motion, at which time the government was represented by Assistant United States Attorneys, Max O. Cogburn, Jr., and H. Thomas Church, and Petitioner was represented by court-appointed counsel, Michael S. Scofield. Having fully considered the evidence and arguments presented at the hearing, as well as the transcripts contained in the record, the undersigned herewith enters the following findings of facts, conclusions of law, and recommendation.

### I. THE EVIDENCE BEFORE THE COURT

#### A. The Evidentiary Hearing

Several witnesses testified at the October 3, 1989 evidentiary hearing on Petitioner's motion. A brief summary of the relevant testimony is set forth below.

1.) Lewis Greg Barentine's Testimony

Petitioner, Lewis Greg Barentine, testified that after he was arrested on July 12, 1985, he contacted Attorney Ken Gordon of Atlanta, Georgia, whom he had known previously, to represent him. At the time of his arrest, Petitioner was engaged to Ms. Leslie Ann Dowling. Petitioner stated he signed over his house in which he and Ms. Dowling were living to Mr. Gordon as collateral for attorney fees.

On or about July 23, 1985, Mr. Gordon came to Charlotte for Petitioner's detention

hearing, but did not visit him in the jail prior to the hearing. At the conclusion of the hearing, the magistrate ordered Petitioner to be detained and he remained in the Mecklenburg County Jail. At some time in late July or early August, after his bond hearing and prior to his trial, Petitioner heard that Mr. Gordon and his fiancée were having a sexual affair, and confronted Mr. Gordon with this information. When Mr. Gordon admitted he had had a sexual relationship with Ms. Dowling, Petitioner became angry and told him he no longer wanted his representation. Petitioner further threatened to do the same thing to Mr. Gordon's wife that Mr. Gordon had done to Leslie Ann Dowling when he got out of jail. Mr. Gordon pleaded with Petitioner to allow him to remain on the case and promised not to have sexual relations with Ms. Dowling again. Petitioner reluctantly allowed Mr. Gordon to continue representing him under these conditions.

On October 14, 1985, the day before Petitioner's trial was to begin, Mr. Gordon advised Petitioner by phone that there was new evidence against him. Petitioner asked Mr. Gordon to come to the jail to talk about preparing for the case or pleading guilty in light of the new evidence. Petitioner stated that Mr. Gordon assured him he would come to the jail that day, but never did. He further stated that he called Ms. Dowling at her hotel that night and asked her to relay a message to Mr. Gordon to come to the jail. Mr. Gordon did not come to the jail that night either.

On the first day of the trial, Petitioner again told Mr. Gordon he did not want to be represented by him. Petitioner testified that he attempted to fire Mr. Gordon because he did not come to the jail and because he was only interested in stealing Petitioner's property and his fiancée. Petitioner stated he felt Mr. Gordon had no loyalty to him, and continued to tell Mr. Gordon he did not want his representation. Petitioner asked Mr. Gordon if the judge was aware of his wishes to fire him, and Mr. Gordon told him he had spoken with Judge Potter, but Judge Potter would not let Petitioner fire him. Petitioner contends

he did not know he could speak out about Mr. Gordon's representation in court.

When Ms. Dowling visited Petitioner in the holding cell during the trial, Petitioner told her that he did not want Mr. Gordon on the case and asked her to contact an attorney in California to represent him. When it became apparent that the California attorney was not available, Petitioner called attorney Thomas Loflin in Durham during a break in the trial to see if he would represent him. However, Mr. Loflin was also unavailable.

Prior to the plea negotiation deadline, Petitioner did not think the evidence against him was strong. Accordingly, he rejected pretrial plea offers of fifteen and twenty years. However, he specifically told Mr. Gordon that he would plead if his exposure was limited to five years. Early in the trial, Petitioner learned that statements he made to United States Customs Agent Hunter prior to his being indicted were going to be used in the case in chief. Because these statements were not in the file before the plea agreement deadline, Judge Potter allowed plea negotiations to be reopened. It was Petitioner's belief that, although he learned of these statements at trial, Mr. Gordon learned of them five to seven days prior to trial but had not informed Petitioner of them. After Judge Potter reopened plea negotiations, Petitioner instructed Mr. Gordon to talk with the Assistant United States Attorney and come to the jail to talk about a plea in light of the new evidence. However, Mr. Gordon later told him he never had a chance to talk with the prosecutor about a plea agreement.

After he had been sent to prison, Petitioner contacted his brother, Rodney Barentine, about the property held as collateral for attorney's fees, and asked him to contact Mr. Gordon. When Petitioner later spoke to his brother, his brother asked why he had not taken the five years which Mr. Gordon said had been offered. Petitioner testified that this was the first time he knew of such an offer, and that, had he known about it during the trial, he would have accepted it.

Some time after the conversation with Petitioner's brother, Mr. Gordon brought the trial transcript to Petitioner in prison. Petitioner asked Mr. Gordon about the five year plea agreement offer. Mr. Gordon admitted that five years had been offered during the reopened plea negotiations, but since he did not think Petitioner would take it, he had not mentioned it to him. Petitioner then became upset at Mr. Gordon and he left.

After Mr. Gordon was appointed to represent Petitioner on appeal, Petitioner filed a motion along with an affidavit of Ms. Leslie Dowling asking that Mr. Gordon not be allowed to represent him. Petitioner stated that Mr. Gordon was then removed from the case and another attorney was appointed to handle the appeal.

### 2.) Rodney Barentine's Testimony

Rodney Barentine, Petitioner's half brother, testified that he called Mr. Gordon several months after the sentencing to find out why his brother received so much time. Mr. Gordon told him there had been a five year plea offer, but he had not told the Petitioner about it because he did not think he would take it. After this conversation, Rodney Barentine talked with his brother and relayed the information about the five year plea agreement. Rodney Barentine testified that his brother became very upset and stated that he had not heard about any such agreement before.

Rodney Barentine also testified about the relationship between Mr. Gordon and Ms. Dowling. He stated that he had heard from family members about the affair, that he spoke with Petitioner about it, and that Petitioner was very angry, and had tried to fire Mr. Gordon.

### 3.) Leslie Ann Dowling's Testimony

Ms. Leslie Ann Dowling testified at the evidentiary hearing that she and Petitioner had dated since March of 1985 and had specific wedding plans. The first time she met Mr. Gordon was on July 23, 1985 when he came to Petitioner's house to evaluate it for his fee and to pick up Ms. Dowling to drive her to Charlotte for Petitioner's detention hearing. After she and Mr. Gordon arrived in Charlotte, they had drinks and dinner and spent the night at a hotel where they had sexual relations. The next day, Mr. Gordon represented Petitioner at his detention hearing.

Ms. Dowling testified that on or about August 4th, she and Mr. Gordon stayed in a hotel in Jacksonville, Florida and again had sexual relations. The next day, she drove Mr. Gordon to Charlotte. Ms. Dowling stated that she and Mr. Gordon continued seeing one other, going out for drinks and dinner and having sexual relations, throughout the trial. In particular she testified that she and Mr. Gordon had sex the night before the trial began, the first day of trial, four to five times during the trial, and the day before and the day after Petitioner's sentencing. According to Ms. Dowling, Mr. Gordon knew that she was engaged to the Petitioner and knew that she was handling the Petitioner's affairs while he was in jail. She further stated that she had contacted the jail minister in Mecklenburg County about performing a marriage ceremony while Petitioner was in jail. She did not recall whether Mr. Gordon knew of this conversation. However, Ms. Dowling did recall that she had expressed to Mr. Gordon her wishes to be married to Petitioner while he was in jail. To further support her contention, Ms. Dowling, on rebuttal, produced a letter from an inmate at the Mecklenburg County Jail which made reference to her marriage plans with Petitioner.

Ms. Dowling testified that prior to the trial, Petitioner confronted her about the affair she was having with Ken Gordon. She promised Petitioner it would not happen again, and because of this promise, Mr. Gordon was allowed to stay on the case. However, despite this promise, Ms. Dowling and Mr. Gordon did continue their affair, and when Petitioner found out about it, he told Ms. Dowling he was going to fire Mr. Gordon because Mr. Gordon was taking his money, stealing his fiancée, and not representing him properly. Ms. Dowling testified that Petitioner asked her to call attorney Tony Sierra in California and ask

if he would represent him. Upon making this call, Ms. Dowling found that Mr. Sierra was not available. Petitioner then called attorney Thomas Loflin to see if he would represent him, but he was also unavailable. Ms. Dowling stated that she had no personal knowledge of whether Mr. Gordon had contacted Judge Potter about the conflict between Mr. Gordon and Petitioner.

Ms. Dowling testified that on the nights she went out with Mr. Gordon, they would stay out until at least 11:00 P.M., and sometimes until 2:00 or 3:00 in the morning. She further testified that during this time, she did not see Mr. Gordon do any case preparation.

On the subject of plea negotiations, Ms. Dowling testified that she knew about the fifteen and twenty year plea offers, but that she did not know anything about a five year plea offer. She further testified that had she known about the five year plea offer, she would have tried to talk Petitioner into taking it.

4.) Pamela A. Nunez's Testimony

Ms. Pamela A. Nunez testified that she was a friend of Wayne Porter, a co-defendant of the Petitioner, and that she got to know Ms. Dowling when she came to Charlotte for the trial.

Ms. Nunez testified that she knew that Ms. Dowling and Mr. Gordon were going out together, drinking and "hot tubbing" at the Marriott. Ms. Nunez stated that Ms. Dowling told her that she was having sexual relations with Mr. Gordon during the trial. Ms. Nunez testified that she spoke with Mr. Gordon about the affair and that Mr. Gordon said he was concerned that the Petitioner might harm him. Ms. Nunez also testified that Wayne Porter had told her that it would not hurt him for Petitioner to testify against him.

5.) Kenneth Gordon's Testimony

Mr. Kenneth Gordon of Atlanta, Georgia testified that he has known Petitioner for some time and had represented him previously on other matters. The day after he returned from his honeymoon with his third wife, Mr. Gordon came to Charlotte for Petitioner's detention hearing and had sexual relations with Ms. Leslie Dowling for the first time. Mr. Gordon testified that Ms. Dowling's testimony concerning his sexual relationship with her was essentially correct except for the accuracy of several times and places. Mr. Gordon admitted that he knew that Ms. Dowling was living at the Petitioner's house and that Ms. Dowling came to Charlotte on Petitioner's behalf. He stated however, that he did not feel they had serious marriage plans. He contended that Petitioner knew of his sexual activities with Ms. Dowling, but that he did not object. According to Mr. Gordon, the reason Petitioner wanted to fire him was because Petitioner wanted a continuance and a severance from the other defendants, not because of the affair.

Mr. Gordon testified that at early stages of the proceedings, it was his understanding that there was not much evidence against Petitioner. However, at the start of the trial, he became aware that one Merle Bell was going to testify against Petitioner. Mr. Gordon made Petitioner aware of this information and of certain tapes in the possession of Customs agents which would seriously incriminate Petitioner. As a result of this newly-revealed evidence, Mr. Gordon made a motion to reopen plea negotiations, which the Court granted.

Mr. Gordon testified that he had approximately 50 conversations with the Assistant United States Attorney during the trial regarding plea negotiations. He stated that a five year plea agreement was never formally agreed upon, but that he was confident that the Government would have made such a recommendation if the Petitioner had agreed to plead guilty and to testify against the co-defendants. Mr. Gordon stated that he told Petitioner of the possibility of a five year plea agreement, and that Petitioner, although receptive at first, refused to discuss the matter toward the end of their conversations. Mr. Gordon stated that the Petitioner rejected the five year plea agreement even after being told that Mr. Bell would testify against him and that the Government tapes would come into evidence. Mr. Gordon testified that he be-

lieved that Petitioner's reason for not accepting the five year plea agreement was because he had an agreement with the other defendants not to testify against each other.

Mr. Gordon testified that he went to the jail to see the Petitioner twenty-five to thirty times, often flying into Charlotte on late night flights. He stated that these visits concerned not only the drug charges, but also Petitioner's divorce, and other potential charges.

6.) Max Cogburn's Testimony

Mr. Max Cogburn, Assistant United States Attorney, testified that several plea offers were made to Petitioner prior to the plea agreement deadline, and that these offers would have been in the fifteen to twenty year range. However, none of the defendants were willing to plead guilty prior to the deadline. Mr. Cogburn further testified that after the plea deadline expired, he continued to try to work out pleas with all the defendants. After the plea negotiations were reopened with regard to Petitioner, he and Mr. Gordon talked about a five year plea agreement on numerous occasion throughout the trial. Mr. Gordon told Mr. Cogburn that Petitioner had refused a five year plea agreement, despite the fact that Mr. Gordon had advised him to accept it. Thereafter, at practically every trial break, Mr. Gordon approached Mr. Cogburn and tried to work out a plea agreement that was less than five years. However, Mr. Cogburn would not go lower than five years. Mr. Cogburn further testified that it was apparent from the tapes that Petitioner wanted to "sell out" the other co-defendants.

Concerning the alleged conflict between Mr. Gordon and Petitioner, Mr. Cogburn testified that he never attended a bench conference where Mr. Gordon said he was having any problems with the Petitioner.

### B. United States Marshal's Phone Log

After the evidentiary hearing in this case, the undersigned reviewed the telephone log maintained by the United States Marshals Service for the time period of Petitioner's trial. The telephone log confirmed Petitioner's testimony that he called Thomas Loflin, an attorney in Durham, North Carolina, during his trial. The parties were advised of this additional evidence and were invited to challenge its authenticity or offer any rebuttal evidence. The Government filed a brief response wherein it argued that this evidence is irrelevant in light of the issues to be decided.

### C. Relevant Portions of the Trial Transcript

At the conclusion of the jury selection for Petitioner's trial, the district court excused the jury and heard several pretrial motions. Among these was a motion by Petitioner's attorney for a continuance and for the reopening of the plea agreement deadline. Because the arguments and representations made on the record at that time are relevant to the present motion, portions of that part of the trial transcript are reproduced below:

MR. GORDON: Your Honor, on October the 9th of 1985, Mr. Cogburn called me and indicated that he had a statement that he had received or discovery from my client dated June 18th, 1982.

. . . . .

I'm making this motion pursuant to Rule 16(a)(1)(A) and 16(d)(2) for a continuance based on the fact that 16(a)(1)(A) requires that the Government turn over upon motion, which was done several months ago, to defendant any of the defendant's statements in the possession, custody, control of the Government, existence of which is known or by the exercise of due diligence may become known.

. . . . .

Your Honor, this may be premature on the disclosure motion, but it's not premature on the motion for continuance because this information was received only yesterday. I was aware of the statement last Wednesday. Your Honor, but it denied Mr. Barentine the effectiveness of me discussing this material with him in regard to whether or not he should enter a plea or go to trial because at that

point in time the deadline for a plea had expired. And Your Honor, if the Court would examine the statement that Mr. Barentine allegedly gave Mr. Hunter on that particular day, the Court will find that that is a critical crucifying statement relating to his involvement in this transaction. And also, his knowledge of the various activities of the alleged co-conspirators. For those reasons, I ask the Court to grant me a continuance and settle Mr. Barentine out at this time.

.    .    .    .    .

MR. COGBURN: Your Honor, this has not been in my possession during this period of time. If you want to say could the Government have had this particular thing, yes. I mean, the United States Government officials had this document. But I have not had this document. Your Honor only has to read that to know that if I had this document, I would be all over him with it. I mean, you just read this and this is a virtual confession in there.

MR. GORDON: There's no question about that.

MR. COGBURN: To the entire crime. I mean, I have attempted. I have talked to him since receiving this and told defense counsel that if defense counsel in view of this new evidence wanted for cause shown to try to reopen the plea negotiations, I would agree to talk to Your Honor about that under the circumstances of such a document coming into our hands.

But there is no reason for me to have tried to withhold or in bad faith keep this document from counsel.

COURT: Mr. Gordon, I will consider a plea agreement, if that's what you want to do in view of this before the case starts, but I'm not going to continue the case.

MR. GORDON: Your Honor, may I have a two-week continuance to consult with my client in that regard?

.    .    .    .    .

MR. COGBURN: I would ask that the Court reconsider, as the Court's already said, the possibility of a plea agreement from the defendants in this case.

COURT: I will reconsider that and allow you to work out a plea agreement, but I'm not going to continue the case. There's no way I can get into that now. Trial Transcript 1–107 to 1–111.

## II.  FINDINGS OF FACTS

The government, Mr. Gordon and Petitioner concede that Petitioner was offered fifteen and twenty year plea agreements prior to trial. Further, the trial transcript clearly establishes that, during a pretrial motions hearing, Mr. Gordon advised the Court of the damaging effect of the new evidence against Petitioner and his desire to re-open plea negotiations so that he could "settle Mr. Barentine out at this time." Assistant United States Attorney Cogburn and Mr. Gordon both credibly testified that Mr. Cogburn advised Mr. Gordon during the renewed plea discussions that the government would accept a five year plea agreement from Petitioner if he would testify against his codefendants. While the parties are in general agreement with regard to the above facts, they dispute the question of whether the Petitioner knew of and had a chance to accept such an agreement.

Petitioner testified that Mr. Gordon never informed him of the possibility of a five year plea agreement. Mr. Rodney Barentine testified that Mr. Gordon told him he did not advise Petitioner of the five year plea offer because he felt Petitioner would not accept it. Mr. Gordon testified that he did advise Petitioner about the five year plea offer, but that Petitioner rejected it and would not discuss the matter further despite Mr. Gordon's repeated attempts to get him to accept it. While the prosecuting attorney had no independent knowledge of whether the five year plea offer was in fact communicated to Petitioner, he did recall that Mr. Gordon stated that Petitioner was angry about the offers being made, and would not agree to plead guilty despite Mr. Gordon's advice to do so. Moreover, the prosecutor credibly testified that Mr. Gordon persisted throughout the trial in his

efforts to obtain a plea agreement that was better than the five year offer which he claimed had been rejected by Petitioner.

Having carefully observed and weighed the credibility of all of the witnesses, and considering the other available evidence in the record, the undersigned finds that Petitioner's testimony, and that of his corroborating witnesses, that he was not advised of the five year plea agreement is simply not credible. Although there are many things about this case that do not make sense, the undersigned finds that it is more credible than not that Petitioner was offered the five year plea agreement and, for reasons known but to himself, rejected that offer despite his attorney's advice to accept it. The trial transcript establishes that, in Petitioner's presence, Mr. Gordon advised the Court that he considered the new evidence against Petitioner to be so damaging that it would be necessary to reopen plea negotiations so that he could "settle Mr. Barentine out at this time." Having made these representations to the Court in front of Petitioner, and having negotiated, at least in principle, a five year plea agreement with the government, it would have made no sense for Mr. Gordon to have failed to advise Petitioner of this offer. Nor would it have made any sense for Mr. Gordon to inform the prosecutor that Petitioner had rejected the five year offer, and then continue to negotiate for a plea agreement that was less than five years, unless Petitioner had in fact been informed of and rejected the five year offer. Although Petitioner claims that Mr. Gordon withheld the five year offer because of his sexual relationship with Ms. Dowling, the undersigned finds such testimony to be incredible. Upon examination of the remainder of the trial transcript, it is apparent that Mr. Gordon did an excellent job of representing Petitioner during the trial. Such a performance totally belies Petitioner's theory that Mr. Gordon was intent upon setting him up so that he would not get out of prison any time soon.

Both Mr. Gordon and Ms. Dowling testified that they were engaged in a sexual relationship before, during, and after Petitioner's trial. The government does not deny the existence of this relationship. Although it has been difficult to discern what Petitioner's true feelings about this affair were during the time that Mr. Gordon represented him, the undersigned finds that Petitioner raised no public objection to this affair until well after his trial and sentencing were concluded.

## III.  CONCLUSIONS OF LAW

After a trial free from error, Petitioner, Lewis Greg Barentine, was convicted by a jury of serious drug trafficking charges and sentenced to thirty-five years imprisonment. By this motion, Petitioner now seeks to set aside this otherwise lawful conviction on the grounds that his attorney failed to communicate to him a five year plea offer which was proposed by the Government during the trial. As a corollary to this claim, Petitioner argues that his attorney's admitted sexual affair with Petitioner's fiancée during the trial created an actual conflict of interest and hostile atmosphere between Petitioner and his own attorney and was the underlying cause of his attorney's failure to advise him of the Government's five year plea offer.

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a two-pronged test for assessing the performance of defense counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.

466 U.S. at 687, 104 S.Ct. at 2064 (emphasis supplied). *Accord, Roach v. Martin*, 757 F.2d 1463, 1476 (4th Cir.), *cert. denied*, 474 U.S. 865, 106 S.Ct. 185, 88 L.Ed.2d 154 (1985). In order to establish prejudice "[t]he defendant must show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068.

### A.) The Uncommunicated Plea Offer

Where defense counsel has failed to inform a defendant of a plea offer, or where defense counsel's incompetence results in a defendant's deciding to go to trial rather than pleading guilty, the federal courts have been unanimous in finding that such conduct constitutes a violation of the defendant's Sixth Amendment constitutional right to effective assistance of counsel. *Turner v. Tennessee,* 858 F.2d 1201, 1205–09 (6th Cir.1988), *vacated and remanded on other grounds,* —— U.S. ——, 109 S.Ct. 3208, 106 L.Ed.2d 559 (1989); *Johnson v. Duckworth,* 793 F.2d 898, 900–902 (7th Cir.), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435, 438 (3rd Cir.1982); *Williams v. Arn,* 654 F.Supp. 226, 235–37 (N.D.Ohio 1986), *vacated and reinstated nunc pro tunc to reflect later filing date,* 654 F.Supp. 241 (N.D.Ohio 1987), *appeal dismissed as untimely filed,* 856 F.2d 197 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 873, 102 L.Ed.2d 996 (1989); *United States v. Bowers,* 517 F.Supp. 666, 671–72 (W.D. Penn.1981). *See also, State v. Simmons,* 65 N.C.App. 294, 300–301, 309 S.E.2d 493 (1983); *Lyles v. State,* 178 Ind.App. 398, 382 N.E.2d 991, 993 (1978); *People v. Whitfield,* 40 Ill.2d 308, 239 N.E.2d 850 (1968).

In *United States ex rel. Caruso v. Zelinsky, supra,* the Third Circuit held that "a failure of counsel to advise his client of a plea bargain would constitute a gross deviation from accepted professional standards ... [and] would deny [a defendant's] Sixth and Fourteenth Amendment rights." 689 F.2d at 438. Moreover, the Third Circuit held, "[a] subsequent fair trial does not remedy this deprivation." *Id.*

To like extent, the Seventh Circuit in *Johnson v. Duckworth, supra,* held

in the ordinary case criminal defense attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and ... failure to do so constitutes ineffective assistance of counsel under the sixth and fourteenth amendments. Apart from merely being informed about the proffered agreement, we also believe that a defendant must be involved in the decision-making process regarding the agreement's ultimate acceptance or rejection.

793 F.2d at 902.

In reaching its decision, the Third Circuit relied on the American Bar Association's Standards for Criminal Justice, which provide that

In conducting discussions with the prosecutor the lawyer should keep the accused advised of developments at all times and all proposals made by the prosecutor should be communicated promptly to the accused.

793 F.2d at 901, *quoting,* I A.B.A. Standards for Criminal Justice Standard 4–6.-2(a) (2d ed. 1980 and 1986 Supp.).

Although the Supreme Court was not faced with the same issues raised in this case, it did observe in *Strickland, supra,* that "[r]epresentation of a criminal defendant entails certain basic duties," which include "duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." 466 U.S. at 688, 104 S.Ct. at 2065.

In light of the above well-reasoned authorities, if it were established that Mr. Gordon failed to advise Petitioner of the favorable five year plea offer, such conduct would have constituted ineffective assistance of counsel and would have violated Petitioner's rights under the Sixth Amendment. However, having found as fact from the credible evidence that Petitioner was informed of the plea offer and rejected his attorney's advice to accept it, the undersigned finds that defense counsel adequately fulfilled his obligations with regard to communicating the plea offer and that Petitioner was not deprived of his constitutional right to effective assistance of counsel.

### B.) Breach of Loyalty and Conflict of Interest

Without a doubt, this case has been complicated by counsel's admitted sexual affair with Ms. Dowling before, during, and after Petitioner's trial. In *Strickland, supra,* the Supreme Court observed that a defense attorney owes to his client a "duty of loyalty" and a "duty to avoid conflicts of interest." 466 U.S. at 688, 104 S.Ct. at 2065. In its general rule regarding conflicts of interest, the American Bar Association Model Rules of Professional Responsibility provide that "a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." Model Rule 1.7(b), *reprinted in,* VIII *Martindale–Hubble Law Directory,* p. 8 (1989). In the Comments under this Rule, the A.B.A. Committee on Ethics and Professional Responsibility further observes that "[l]oyalty is an essential element in the lawyer's relationship to a client," and that this loyalty is

> impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client.
> *Id.*

The Comments further observe that "[t]he lawyer's own interests should not be permitted to have an adverse effect on representation of a client," and that "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice." *Id.*

To like extent, the American Bar Association Standards for Criminal Justice provide that

> [t]he duties of a lawyer to a client are to represent the client's legitimate interests, and considerations of personal and professional advantage should not influence the lawyer's advice or performance.
> Standard 4–1.6.

[a]t the earliest feasible opportunity defense counsel should disclose to the defendant any interest in or connection with the case or any other matter that might be relevant to the defendant's selection of a lawyer to represent him or her.
Standard 4–3.5(a).

In the Commentary to Standard 4–3.5 the Committee observed that "[t]he basic rule that must guide every lawyer is that the lawyer's total loyalty is due each client in each case."

■ In light of the above authorities, it is clear that Mr. Gordon's sexual involvement with Ms. Dowling, whether she was Petitioner's fiancee or just a girlfriend, constituted a breach of loyalty to Petitioner and created the potential for a conflict of interest. However, as noted above, Petitioner makes no claim of error during his trial. Further, because the undersigned has found as fact that Petitioner was advised of the favorable plea offer and rejected it against the advice of his attorney, Mr. Gordon's adulterous affair with Ms. Dowling cannot be held responsible for Petitioner losing a favorable plea bargain opportunity. In short, as reprehensible as Mr. Gordon's conduct may have been, absent any showing of prejudice to Petitioner's defense, there are no valid grounds for reversal of Petitioner's otherwise legitimate conviction and sentence on serious drug charges that occurred after a jury trial that was free of any error. Indeed, the only relief which could be supported by the record in this case would be appropriate sanctions against defense counsel for having used his appearance in this case as an opportunity to engage in an adulterous affair.

## IV. RECOMMENDATION

Wherefore on the basis of the foregoing, the undersigned Magistrate respectfully recommends that Petitioner's Motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255 be *denied.*

Further, in light of the undisputed evidence of Mr. Gordon's adulterous affair with Leslie Ann Dowling during the course

of his representing Petitioner in this Court, the undersigned respectfully recommends that the district court consider appropriate sanctions against Mr. Gordon, including barring him from further appearances in this district.

## V. NOTICE OF APPEAL RIGHTS

Counsel are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Failure to file objections to this Memorandum with the district court will preclude counsel from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).