UNITED STATES, Appellee

v

FREDDIE HANDSOME, Private, U. S. Army, Appellant

21 USCMA 330, 45 CMR 104

No. 24,668

April 21, 1972

*Captain John D. Lanoue* argued the cause for Appellant, Accused. With him on the brief was *Colonel George J. McCartin, Jr.*

*Captain James F. Motley* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Lieutenant Colonel Ronald M. Holdaway, Captain David E. Wilson,* and *Captain Benjamin P. Fishburne, III.*

## Opinion of the Court

DARDEN, Chief Judge:

A general court-martial composed, in compliance with Private Handsome's request, of only a military judge found Private Handsome guilty of robbery and sentenced him to a dishonorable discharge, total forfeitures, and confinement at hard labor for 4 years. The findings and sentence are unchanged after earlier appellate review. We granted review on an issue concerning the admissibility of a pretrial statement and on whether a statement by the military judge reflected an erroneous conception of the burden of proof after the voluntariness of a pretrial statement is in question.

The details of the robbery itself are unimportant to an understanding of the issues. After an attempted robbery occurred at Fort Jackson on August 7, 1970, the robbery of another victim was consummated on August 8. On August 10, Private Handsome was placed in a lineup. The victim of the August 8 robbery tentatively identified Handsome. Although the evidence is conflicting in some detail on the circumstances of his decision to submit to a polygraph test, Private Handsome was transported to Fort Gordon on August 19 and given such a test there. He made an admission at Fort Gordon and, after returning to Fort Jackson, he gave a statement that amounted to a confession of the robbery.

Two factual issues arose from conflicting testimony of Private Handsome and a criminal investigator, Specialist Six Morris R. Worsham.

This is the appellant's account of what happened after the lineup: He denied involvement in the attempted robbery of August 7. Because he had several witnesses to substantiate his alibi, he volunteered to take a lie detector test. He denied that the investigator, Agent Worsham, had informed him he was suspected of the August 8 robbery, and he denied that Agent Worsham informed him that the results of a polygraph test could not be used against him in court.

Agent Worsham's version of the same topics differs in these ways: He contended that he had informed the appellant of his being suspected of the August 8 robbery and that on both August 10 and August 19, the day of the trip to Fort Gordon for the polygraph test, he had assured the appellant that polygraph test results would be inadmissible in evidence at a court-martial.

As the trier of fact in this instance, the military judge decided these testimonial differences against the appellant.

The issue before us now is how to treat a statement the polygraph operator, a Chief Warrant Officer Christopherson, made to the appellant. We must decide whether this statement was only an indicium of unlawful inducement or whether it was unlawful inducement as a matter of law.

**331**

Only slight differences exist between the recollection of the polygraph operator and the recollection of the appellant of the statement in question. Before the polygraph operator made the statement, he accused the appellant of deceiving him. On this point the appellant testified:

"A After I told him I didn't, he said he had another one that had the same case like mine, and he said they found that he was guilty so they gave him three years and a DD. He said, 'If you go on and confess, you could get off lighter.'

"Q Why after this did you make a statement?

"A I figured that they had took the tests and had already found out about it. I thought I might as well go ahead and it might be a lighter sentence.

"Q What, if anything, did they say about the lie detector results being used against you?

"A I never heard them say nothing about it.

"Q Did you feel that these results could be used against you?

"A Yes, sir. I figured that is what the tests were all about.

"Q When you returned to Fort Jackson, what, if anything, did they say to you concerning the lie detector results?

"A They didn't say nothing about it.

"Q When you were at Fort Jackson and made a statement, why did you make that statement?

"A I figured they had the tests, and he was telling me they found out about it, and, without me confessing, the sentence sounds hard, three years, so I went ahead and told them that I did it."

When the prosecution indicated that it had no further evidence to present on the admissibility of the confession, the military judge pointed out that he had before him an unrebutted statement by Private Handsome that he would benefit if he gave a pretrial statement. The military judge granted a recess to permit trial and defense counsel to interview the polygraph operator, George R. Christopherson. When the court opened again, the prosecution offered, and the defense did not object to, a stipulation of expected testimony by Chief Warrant Officer Christopherson. The relevant part of that stipulation is:

". . . After administering the test in four separate sections, I left the room to score the test. I returned to the room and told the accused that the test showed he was lying to me, which was my opinion after scoring the test. I then asked the accused if he was willing to tell the truth. I then told the accused that I had a similar case concerning another accused robber who had lied to me for over two hours after I told him the results of his examination. I then told him that this man was convicted and sentenced to three years' confinement at hard labor. I told him that it could only have benefited the other man to tell me the truth. I did not specify how it could have benefited him. I then told Private Handsome that it could only benefit him if he would tell me the truth, but I did not specify how it could in fact help the accused. I then asked him if he wanted to tell me the truth. He then made an admission to me, and I turned him over to the CID investigator."

After argument by counsel, the military judge declared:

". . . I have listened to arguments of counsel. I did independent research in this matter myself. It appears to me that the accused through his own testimony has indicated that he understood his rights. He understood he had a right to remain silent and that he had a right to counsel and the other constitutional protections afforded him. Considering everything, it appears to me that the accused followed a pattern of voluntary acts. He volunteered to take an examination. He volunteered to answer

questions. He stated that he never did tell the agents he didn't want to talk. He indicated, even accepting his story that he was informed that he was to be interrogated at the polygraph examination but he was not aware of the nature of this examination until he got there, he agreed and entered into this examination voluntarily. It appears to me that the accused for reasons for his own benefit and as his own voluntary act agreed to make a statement. I think that the law stated by the Government is correct. Every case must be decided on its facts. The question is was the free will of this accused overcome by unlawful inducement, and I find no compelling evidence to indicate that this was the fact. I am going to overrule your objection. Unless there is further evidence forthcoming, I will admit Prosecution Exbihit 1 for identification in evidence as Prosecution Exhibit 1."

Supreme Court authority for the statement that admonishing a person to tell the truth is not ▪ coercion, unlawful inducement, or improper influence is Sparf v United States, 156 US 51, 39 L Ed 343, 15 S Ct 273 (1895). The cases cited in *Sparf* support this statement for the reason "that telling a man to be sure to tell the truth is not advising him to confess anything of which he is really not guilty." 156 US, at page 56.

But if an exhortation or adjuration to speak the truth is connected with suggestions of a threat or benefit, the confession is inadmissible. This Court has followed the law of the Article III courts in this area, and for Article III courts the basic authority for the exclusion of confessions connected with threats or benefits is Bram v United States, 168 US 532, 542–543, 42 L Ed 568, 18 S Ct 183 (1897). The quotation cited with approval in *Bram* that:

" 'But a confession in order to be admissible must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' "

has, in turn, been quoted with approval many times in decisions by the Supreme Court of the United States and this Court. See, *e.g.*, Malloy v Hogan, 378 US 1, 12 L Ed 2d 653, 84 S Ct 1489 (1964), and United States v Askew, 14 USCMA 257, 261, 34 CMR 37 (1963). Bram had been held in irons, stripped of clothing, and was led to believe that he would benefit from a confession of guilt implicating an accomplice. That evidentiary setting is much different from the one we are considering.

Even though this difference exists, the polygraph operator went far beyond a statement that the accused would benefit by telling the truth. He cited an example of a person with the same test results who received a relatively severe sentence after continuing to deny guilt. He stated that the other suspect would have benefited by telling the truth and that Private Handsome would also benefit if he told the truth.

The military judge obviously recognized that an issue of voluntariness resulting from possible coercion or unlawful inducement had been created. In such a situation, the military judge had to be convinced beyond a reasonable doubt that the admission of Private Handsome had not resulted from the polygraph operator's citation of a horrible example and his implied promise of a benefit. When the military judge summarized his recollection of the testimony on this issue, he expressed a concern that the polygraph

operator's statement implied a promise of reward. He continued:

"... Is that not a reasonable interpretation ... I am asking the Government. Give me another reasonable interpretation."

The trial counsel agreed:

"... I am sure that it might be a reasonable interpretation if you were in the shoes of the accused, worried, and upset."

Then the trial counsel proceeded to argue that although a promise of reward was a reasonable inference in this instance, this was not an unlawful inducement under the present state of the law. With this we disagree.

Despite our scrutiny of the record, we are unable to find any substantial evidence that the admission resulted from forces other than Chief Warrant Officer Christopherson's statements to Private Handsome. The record supports determinations that Private Handsome had been informed he was suspected of the August 8 robbery and that he was informed that the results of a polygraph test would be inadmissible against him. The record also supports a determination that Private Handsome's submitting to the polygraph test was voluntary. But this is not enough to dispel the strong indication that Warrant Officer Christopherson's combination of threat and promise induced the admissions. Until Warrant Officer Christopherson's statements, Private Handsome had denied complicity. Immediately after the statements, Private Handsome admitted his involvement. The content of Warrant Officer Christopherson's statements and the promptness of the admission that followed establish the strong likelihood of a cause-to-effect relationship. We conclude that the operator's tactics amounted to unlawful inducement and influence as a matter of law.

Since the conclusions of a polygraph test are inadmissible in evidence in a trial by court-martial,[1] interrogators who suggest that a suspect submit to such a test obviously hope that in some way the psychological effect of the test is to provide an admission or confession from a suspect who is guilty. A guilty suspect who agrees to such a test after having been warned that its results are inadmissible against him is engaging in a form of gamesmanship himself. But his doing this does not justify a Government agent's comparing the suspect's results with those of another suspect who received a stiff sentence and stating that in some inexplicable way the first suspect would have benefited from confessing and that the second one would benefit, too. Because of the Manual provision[2] excluding the results of polygraph tests from evidence in a court-martial, use of such tests by the Government imposes a high burden of care on the polygraph operators and other interrogators to avoid using the test results in an improper way.

Our decision on the first issue makes consideration of the second issue unnecessary.

We reverse the decision of the United States Army Court of Military Review and return the record of trial to the Judge Advocate General of the Army. A rehearing may be ordered.

Judges QUINN and DUNCAN concur.

---

[1] Paragraph 142e, Manual for Court-Martial, United States, 1969 (Revised edition).

[2] Ibid.