**UNITED STATES**

v.

**Staff Sergeant Gary A. WASHINGTON, FR093–60–2294, United States Air Force.**

**ACM 30804.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 28 July 1992.

Decided April 21, 1995.

Appellate Counsel for Appellant: Mr. Vaughan E. Taylor (argued), Colonel Jay L. Cohen, Captain Eric N. Eklund, and Captain Richard D. Desmond.

Appellate Counsel for the United States: Captain Timothy G. Buxton (argued), Colonel Jeffery T. Infelise, Colonel Thomas E. Schlegel, and Major John H. Kongable.

Before HEIMBURG, PEARSON, and BECKER, Appellate Military Judges.

## OPINION OF THE COURT

BECKER, Judge:

Members convicted the appellant, contrary to his pleas, of six specifications of accepting or soliciting bribes or graft totaling over $70,000 (in violation of Article 134, UCMJ [1]), one specification of impersonating an agent of superior authority (also a violation of Article 134), two specifications of extortion (in violation of Article 127, UCMJ [2]), four specifications of larceny of currency, property of the United States, totaling over $20,000 (in violation of Article 121, UCMJ [3]), two specifications of violating Air Force Regulation 30–30 by soliciting or accepting gifts from contractors (in violation of Article 92, UCMJ [4]), and two specifications of conspiracy to commit larceny (in violation of Article 81, UCMJ [5]). Appellant was sentenced to a bad-conduct discharge, confinement for 10 years, forfeiture of $250 per month for 10 years, reduction to E–1, and a fine of $70,000. All the alleged offenses arose out of the appellant's service as a contingency contracting officer at Al Dhafra Air Base in the United Arab Emirates (U.A.E.) from September 1990 through March 1991, during Operations Desert Shield and Desert Storm. According to the prosecution's evidence, the appellant, with the assistance of his driver, one Omar

---

1. 10 U.S.C. § 934 (1988).

2. 10 U.S.C. § 927 (1988). Appellant was acquitted of one other specification of extortion.

3. 10 U.S.C. § 921 (1988).

4. 10 U.S.C. § 892 (1988). Appellant was acquitted of two specifications alleging AFR 30–30 violations.

5. 10 U.S.C. § 881 (1988).

Hassan, solicited and accepted bribes and kickbacks from several U.A.E. businessmen as "commissions" for awarding (or influencing the award of) Air Force contracts, and threatened contractors with cancellation of their contracts unless they continued to pay him what he asked. The larceny and conspiracy convictions were based on evidence of collusion between the appellant and contractors to inflate prices, thereby increasing the contractors' profits and the appellant's "commissions."

Appellant asserts twelve assignments of error. Most prominent among them are that his trial defense counsel were ineffective, the court-martial was tainted by unlawful command influence, the military judge erred in denying his motion to suppress his incriminating statements to the Air Force Office of Special Investigations (AFOSI), and he was subjected to unlawful pretrial punishment in violation of Article 13, UCMJ.[6] We find no error affecting the lawfulness of the convictions, and affirm all findings of guilty. However, we agree with the appellant's Article 13 argument, and modify his sentence accordingly.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Background

This assignment of error calls upon us to consider the relationship, if any, between the Sixth Amendment and sexual activity between members of the defense team. Appellant's trial defense counsel were Mr. HAB, a civilian attorney practicing in Columbia, South Carolina, and Captain CDH, then Area Defense Counsel at Charleston Air Force Base, South Carolina. Captain H has since separated from the Air Force. Together, Mr. B and Captain H represented the appel-

lant from the Article 32, UCMJ,[7] investigation in March 1992, through the nearly three-week trial at Shaw Air Force Base, South Carolina, in July 1992. This period included a three-week trip by Mr. B and Captain H to the U.A.E. to conduct depositions and other pretrial investigation. Due to problems obtaining a visa, the appellant did not at first accompany his counsel to the U.A.E., but arrived some days later.

Somewhere along the line—the appellant claims it was while his lawyers were alone in the U.A.E.—Mr. B (who was married) and Captain H (who was not) became romantically involved. Appellant stumbled onto this relationship after the trial, when Mr. B sent him a bundle of case materials. Obviously unbeknownst to Mr. B, there were cards and notes from Captain H to Mr. B tucked away in these files. These epistles, although not sexually explicit, certainly revealed an intimate, personal relationship.

Appellant seized upon this as proving that his lawyers did not adequately investigate and prepare his case while in the U.A.E., choosing instead to take advantage of the trysting opportunities presented by the trip. In the appellant's words, his lawyers "could not have had a better time on the 'Love Boat,'" and put his case "on the back burner if they considered it at all." He contends this is the reason his attorneys put on virtually no evidence on his behalf, during either the findings or the sentencing phase of the trial.[8] Specifically, the appellant argues his lawyers should have introduced testimony from other U.A.E. contractors who were willing to describe the appellant as an honorable person who did not solicit or accept bribes or kickbacks. He also contends that Mr. B and Captain H improperly struck a deal with the trial counsel to excise portions of certain

---

**6.** 10 U.S.C. § 813 (1988).

**7.** 10 U.S.C. § 832 (1988).

**8.** In findings, the defense called only one witness, Colonel Rust. He was an adverse witness, whom the defense contended was responsible, in part, for coercing the appellant's statements to the AFOSI. Although the military judge had earlier denied the defense motion to suppress these statements, the defense called Colonel Rust

as part of its attack on the weight the members should give the statements. In addition, the defense introduced several documentary exhibits during extensive cross-examinations of prosecution witnesses. Appellant did not testify in findings. In sentencing, the defense called no witnesses, but introduced several written statements from character witnesses and many other documents as mitigation evidence. Appellant made an unsworn statement in sentencing.

videotaped depositions,[9] which he claims implicated his counsel in attempts to bribe witnesses during the trip to the U.A.E.

After the appellant found the love notes, his new civilian lawyers filed a motion for a post-trial Article 39(a), UCMJ,[10] session to consider the appellant's claim of ineffective assistance of counsel.[11] The prosecution opposed the motion. Before ruling, the military judge permitted discovery and submission of affidavits from all counsel. In their affidavits, Mr. B and now-Ms. H avoided any discussion of their personal relationship, and reviewed in detail their case preparation and reasons for tactical decisions. They described their efforts on behalf of the appellant as, in a word, monumental. In particular, they told of difficulties in preventing their client from bribing and threatening U.A.E. witnesses with deportation.[12] According to Mr. B and Ms. H, they decided—with the appellant's consent—to present very little evidence in either findings or sentencing, to prevent the prosecution from introducing the appellant's threats and bribery attempts in rebuttal. The affidavits of the two defense counsel and the two trial counsel all say the editing of the depositions resulted from agreement that the bribery references were uncharged misconduct, which was not admissible against the appellant in the prosecution's case-in-chief. *See* Mil.R.Evid. 404(b), 403.

Based on the affidavits and other documents, the military judge found Captain H and Mr. B "did carry on an adulterous relationship during the period they were representing the accused." However, she denied the motion for a post-trial Article 39(a) session, ruling the appellant had not made out a claim of ineffective assistance of counsel.

## B. General Rules and Standards of Review

■ We presume the competence of trial defense counsel unless an appellant points out errors which are unreasonable under prevailing professional norms. *United States v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984); *United States v. Harris,* 34 M.J. 297, 299 (C.M.A.1992). The appellant must show (1) his counsel's performance was so deficient that they were, in effect, not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) his counsel's errors were so serious as to deprive him of a fair trial, that is, a trial whose result is reliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987). A defense counsel's failure to investigate potential defenses may be ineffective assistance. *See, e.g., Scott.* However, we will not second-guess tactical decisions. *United States v. Morgan,* 37 M.J. 407, 410 (C.M.A.1993); *United States v. Dale,* 39 M.J. 503, 506 (A.F.C.M.R.1993).

■ An accused is entitled to defense counsel who are free from conflicts of interest. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *United States v. Caritativo,* 37 M.J. 175, 178 (C.M.A. 1993); *United States v. Newak,* 24 M.J. 238 (C.M.A.1987); *United States v. Breese,* 11 M.J. 17 (C.M.A.1981). However, before an alleged conflict of interest may be the basis for a finding of ineffective assistance, an accused must demonstrate an *actual* conflict which *affected* his lawyers' performance. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).

## C. Sex and the Sixth Amendment

Sexual conduct by defense counsel has, at times, created conflicts of interest implicating

---

9. With only one exception, the U.A.E. witnesses refused the trial counsel's invitations to attend the court-martial at Shaw. *See* Article 46, UCMJ (10 U.S.C. § 846 (1988)); R.C.M. 703(e)(2)(A) (Discussion), (E)(i), (ii). Over defense objections, the military judge admitted the videotaped depositions of the unavailable witnesses as exceptions to the rule against hearsay. *See* Mil.R.Evid. 804(b)(1). Appellant has not assigned these rulings as error.

10. 10 U.S.C. § 839(a) (1988).

11. *See* R.C.M. 1102(b)(2).

12. Although living and working in the U.A.E., the contractors involved in this case were citizens of either Saudi Arabia, Lebanon, or Germany, and were potentially subject to visa revocation and deportation for misconduct.

an accused's Sixth Amendment right to effective assistance of counsel. *See Barentine v. United States,* 728 F.Supp. 1241 (W.D.N.C. 1990), *aff'd,* 908 F.2d 968 (4th Cir.1990) (defendant suffered no prejudice from potential conflict of interest created by defense counsel's affair with defendant's fiancee); *People v. Blalock,* 197 Colo. 320, 592 P.2d 406 (1979) (defendant denied effective assistance of counsel where defense counsel had prior sexual relationship with alleged sexual assault victim). Our research has disclosed no case involving a sexual relationship between defense counsel. However, in *United States v. Babbitt,* 26 M.J. 157 (C.M.A.1988), the Court of Military Appeals addressed the sexual relationship between a defense counsel and his client. We find that opinion instructive.

In *Babbitt,* the accused (who was single) and her civilian defense counsel (who was married) became emotionally involved during the case, culminating in sexual intercourse on the night before the last day of the trial. On appeal, Captain Babbitt argued this created a conflict of interest which denied her effective assistance of counsel. In affirming Babbitt's conviction, the Court of Military Appeals rejected her argument that sexual relations between defense counsel and client *per se* create a conflict of interest which undermines the Sixth Amendment guarantee of effective assistance. Instead, the court examined the record of trial, which revealed a thoroughly competent effort by the defense counsel, and agreed with the Army Court of Military Review that counsel's representation " 'was, if anything, spurred on by his relationship with appellant.' [citation omitted]." 26 M.J. at 159.

■ We find the *Babbitt* reasoning applicable here. We decline to adopt a rule that sexual relations between defense counsel during their representation of an accused *per se* create a conflict of interest which violates an accused's right to effective assistance of counsel. Such conduct (at least without the knowledge of the client), at a minimum, shows poor judgement and, as in this case, may be unlawful. Nonetheless, we must acknowledge that, similar to *Babbitt,* certain aspects of a romantic relationship between counsel can work to a client's benefit. Certainly, it cannot be said the appellant's lawyers were not talking to each other. *Compare United States v. Mansfield,* 24 M.J. 611 (A.F.C.M.R.1987) (counsel were ineffective because, among other reasons, they did not communicate regarding insanity defense preparations). Instead of invoking a *per se* rule, we will examine the record of trial and relevant post-trial exhibits, and apply the two-prong *Strickland/Scott* test.

## D. Decision

■ The documented performance of the trial defense team belies any serious argument that they indulged in romance at the expense of case preparation. Their decision to keep a low evidence profile to avoid potentially devastating rebuttal is quite reasonable, and we will not play "Monday morning quarterback" with their professional judgement. The defense team's level of preparation in this complicated and difficult case was very high. Indeed, seldom has this Court seen a case so energetically defended at the pretrial motions stage, where every significant piece of prosecution evidence was the subject of a motion to suppress or a motion *in limine.* During the prosecution case-in-chief, defense counsel rarely allowed a doubtful question from trial counsel to pass without objection. The defense also made aggressive, well-prepared attacks on the credibility of prosecution witnesses. This was especially the case for the deposition testimony videotaped in the U.A.E. at a time when, according to the appellant, his lawyers had put his case on the "back burner" to cruise on the "Love Boat."

■ The record also fails to show a conflict of interest created by either defense counsel's supposed connection with any bribery attempts by the appellant. The only reference we can find to such a connection is in the deposition of Omar Hassan, the appellant's driver. Hassan testified that he had kept the appellant's "commission" money in a box in his apartment until the appellant took the box. Also according to Hassan, the appellant owed him some of this money. During his deposition, Hassan described an encounter with the appellant and one of his lawyers (apparently, Mr. B), during which

the appellant asked Hassan to "help me." Hassan replied:

> And in front of his lawyer I said, "I'm—if you want help, give me this box money back—give me what I tell you back." He said, "What?" I said, "Give me this box what I said back." And his lawyer, he said, "What box?" And Gary, he start to tell me what and his lawyer said, "Wait." He said, "What box." I said [to the lawyer] "Gary, he [referring to Gary] know what box...."

This exchange raises no inference of involvement by Mr. B with any attempt to bribe Omar Hassan. To the contrary, it is apparent Mr. B was ignorant of the money box until this conversation, and sought to stop any further "negotiation" until he could find out what was happening. We conclude that defense counsel were furthering only their client's interests when they and trial counsel agreed to edit this portion out of the Hassan video deposition before it was played to the members.

In sum, we find the appellant has failed to carry his burden of demonstrating the first prong of the *Strickland/Scott* test. There was no conflict of interest raised by either the relationship between the defense counsel, or by Mr. B's presence when the appellant and Hassan discussed the "box money." The record of trial reflects performances by both defense counsel which are well above the minimum required by the Sixth Amendment. Therefore, we resolve this assignment of error against the appellant without reaching the second prong of the *Strickland/Scott* test.

## II. UNLAWFUL COMMAND INFLUENCE

### A. Background

Appellant is highly critical of the attitudes and actions of three officers—Colonel Rust in the U.A.E., and Majors Blanchette and Biankini back at Shaw. He rolls all of his complaints into an allegation that his trial was tainted by unlawful command influence, in violation of Article 37(a), UCMJ.[13] At trial, he moved to dismiss all charges and specifications on this ground, but the military judge denied the motion.

Colonel Rust was in charge of logistics at Al Dhafra Air Base, which included the base contracting activities.[14] As such, he was a high-level supervisor of the appellant. After the appellant's apprehension in the U.A.E. on 6 March 1991, AFOSI agents interrogated him the rest of that afternoon and evening and, after an overnight break, on the morning of 7 March. On 6 March, Colonel Rust came into the interview room and spoke to the appellant. According to the appellant, Colonel Rust was insulting, told the appellant that he would like to spit on him, and called him a "black Jew." Appellant and Colonel Rust also met the next morning, although how this came about is in dispute.[15] Appellant claims Colonel Rust implied during this meeting that he would take care of the appellant's legal problems in return for his cooperation with the AFOSI. In his testimony, Colonel Rust admits he entered the AFOSI interview on 6 March, that he was upset, and that he told the appellant he would like to spit in his eye. Colonel Rust agreed that he met with the appellant the following morning, but said he made no promises other than for fair treatment and to contact the appellant's family. Colonel Rust denied personally calling the appellant a "black Jew," but admitted telling him during their 7 March conversation that local merchants referred to him by that epithet. On 6 March, Colonel Rust also gave the appellant a written order not to contact anyone in Contracting at Al Dhafra, or anyone in Abu Dhabi or Dubai. After completing his statement to AFOSI on 7 March, the appellant was taken to Riyadh, Saudi Arabia. Several days later, he flew back to Shaw, arriving on 22 March 1991.

13. 10 U.S.C. § 837(a) (1988).

14. At various points in the record, Colonel Rust's position is described as the appellant's "commander," the "deputy commander for logistics," or like titles. Colonel Rust's precise title is not material. It is clear his authority included supervision of the contracting function at Al Dhafra.

15. This dispute becomes important in considering the voluntariness of the appellant's statements to the AFOSI. This issue is addressed in section III of this opinion.

After his return to Shaw, the appellant's commander (Major Biankini) assigned him to work in the squadron orderly room. He was not allowed in the Contracting Office to pick up his personal effects. These were collected for him, and picked up by his wife.

On 10 July 1991, Major Biankini reassigned the appellant to work for the Noncommissioned Officer in Charge of the base Correctional Custody and Transition Flight programs, and gave him a written order not to make contact "in any way" with personnel assigned to the Contracting Office. The literal wording of this order was broad enough to prohibit even social contact between the appellant and his former co-workers. Appellant testified that he interpreted the order literally and, in one instance, he did not attend the annual Contracting Office family Easter Egg hunt because of the order.

Concerning his reassignment, the appellant was not actually placed in either the Correctional Custody or the Transition Flight program,[16] but he was required to sign in and out of the area. Appellant's duties included menial "weeds and seeds" tasks, such as landscaping, planting, and weeding. He also hauled trash, painted, and cleaned duck droppings from rocks at the base duck pond. Appellant performed these chores personally, and did not supervise lower-ranking airmen. Appellant claims Major Biankini reassigned him in retaliation for revealing unflattering information about her to his lawyers. According to other witnesses, Major Biankini issued the "no contact" order and reassigned the appellant after complaints that he was a disruptive influence in the orderly room and in Contracting, where he had been visiting his former co-workers.[17]

Major Blanchette was the chief of the Contracting Office at Shaw. Appellant alleges Major Blanchette's negative attitude toward him, in combination with Major Biankini's "no contact" order, hindered preparation of his defense. As an example, it was Major Blanchette who instructed office members that the appellant was not invited to the Easter Egg hunt. The Shaw wing commander rescinded all "no contact" orders on 1 April 1992, at the request of the appellant's defense counsel. At no time had Major Biankini's or Colonel Rust's orders affected the ability of appellant's attorneys to contact witnesses. Notwithstanding, the appellant claims Major Blanchette's continuing hostility resulted in reluctance among his former co-workers to come forward as favorable witnesses. Appellant introduced evidence of two specific instances in support of this contention. He and a former co-worker testified that, on one occasion, the appellant approached the worker in the office (apparently after the 1 April 1992 rescission of the "no contact" order), only to be rebuked by Major Blanchette for not letting him know in advance. In addition, the defense paralegal specialist assigned to the Shaw Area Defense Counsel office testified the squadron first sergeant had upbraided her for scheduling an appointment with a prospective witness which had disrupted the witness' lunch hour, and instructed her to go through him for future appointments. Further, two Contracting noncommissioned officers (NCOs) testified they had, at one time, feared repercussions from Major Blanchette if they helped the appellant. However, these NCOs admitted that neither Major Blanchette nor anyone else had directly said or done anything to cause such a fear. Other Contracting NCOs testified the appellant had met with Contracting personnel without hindrance (again, apparently after the wing commander had rescinded the "no contact" order), and they had no fear of retaliation from helping the appellant. On cross-examination, the appellant admitted he had talked to everyone in Contracting, except two civilian employees who had not served in the

**16.** Correctional Custody is a type of punishment which commanders may impose under their nonjudicial punishment authority. *See* Article 15(b)(2)(B), (b)(2)(H)(ii), UCMJ (10 U.S.C. § 815(b)(2)(B), (b)(2)(H)(ii) (1994)); MCM Part. V ¶ 5(b)(2)(A)(ii), (b)(2)(B)(ii) (1984). "Transition Flight" is strictly a local-option program where commanders may assign airmen pending administrative discharge for cause.

**17.** Appellant also points to these actions in support of his claim of unlawful pretrial punishment, in violation of Article 13, UCMJ. We address this issue in section IV of this opinion.

U.A.E. Appellant did not say what evidence he expected from these two civilians.

### B. General Rules and Standards of Review

 Unlawful command influence is the mortal enemy of military justice. *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986), *cert. denied*, 497 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Interference with an accused's access to witnesses is a form of unlawful command influence, when done under the mantle of command authority. *Id.* at 394; *see also United States v. Dykes*, 38 M.J. 270 (1993); *cf. United States v. Stombaugh*, 40 M.J. 208, 212–213 (C.M.A. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1113, 130 L.Ed.2d 1077 (1995) (witness harassment by members of the unofficial "Junior Officers Protection Association" was not under mantle of command authority).

 The burden of producing evidence of unlawful command influence is on the appellant. *Stombaugh*, 40 M.J. at 213. "[T]he threshold triggering further inquiry should be low, but it must be more than a bare allegation or mere speculation." *United States v. Johnston*, 39 M.J. 242, 244 (C.M.A. 1994). "[T]here must be something more than an appearance of evil to justify action by an appellate court in a particular case. 'Proof of [command influence] in the air, so to speak, will not do.'" *United States v. Allen*, 33 M.J. 209, 212 (1991), *cert. denied*, 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). To carry this burden of production,

... an appellant must (1) "allege [ ] sufficient facts which, if true, constitute unlawful command influence"; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness.... The same three-pronged analysis would apply to an allegation of unlawful interference with access to witnesses.

*Stombaugh*, 40 M.J. at 213 (quoting *United States v. Levite*, 25 M.J. 334, 341 (C.M.A. 1987) (Cox, J., concurring)).

 Once an appellant satisfies his burden of production, the burden of proof is on the government to disprove the allegation. *Stombaugh*, 40 M.J. at 213–214. We must then be "persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *Thomas*, 22 M.J. at 394; *accord Stombaugh*, 40 M.J. at 214.

 If a command influence issue has been addressed at trial, we will defer to the military judge's findings of fact, unless they are clearly erroneous. *See United States v. Wallace*, 39 M.J. 284, 286 (C.M.A.1994). However, whether "unlawful command influence" flows from those facts is a question of law, which we review *de novo. Id.*

### C. Decision

 The appellant has carried his burden of production as to the first prong of the *Levite–Stombaugh* test. He introduced the orders from Colonel Rust and Major Biankini, and testified the orders prevented him from personally contacting potential witnesses. He also produced testimony from two Contracting NCOs to the effect that the atmosphere in the office was poisoned against the appellant, and they feared adverse career consequences if they helped him. Finally, the Shaw defense paralegal's clash with the first sergeant over appointment procedures might be argued as command interference with access to witnesses. In denying the appellant's motion to dismiss, the military judge found "no evidence of command influence, either actual or perceived." We do not agree with this conclusion. Viewed in the light most favorable to the appellant, the evidence is sufficient to cross the low threshold for satisfying the first prong of the *Levite–Stombaugh* production test—if the appellant's factual allegations were true, they would constitute unlawful command influence.

 However, the appellant has failed to carry his burden of producing evidence as to the second *Levite–Stombaugh* prong, that is, to show that the proceedings were unfair. The record shows quite the contrary. Clearly, neither Colonel Rust's actions nor his "no contact" order had any effect at all on the appellant's access to witnesses. The evidence shows the appellant was whisked away from the U.A.E. to Riyadh, Saudi Arabia,

soon after his AFOSI interrogation had been completed. After several days stay in Riyadh, the appellant returned to Shaw. Appellant offered no evidence about what he could have or would have accomplished in the U.A.E. had Colonel Rust not issued his "no contact" order. Moreover, the appellant had unrestricted access to the Air Force Area Defense Counsel in Riyadh, and did meet with him. Colonel Rust's order, of course, had no effect on the ability of any defense attorney to contact potential witnesses. Turning to the Biankini "no contact" order at Shaw, this order also did not purport to limit access by the appellant's defense lawyers to anyone in the Contracting Office. The record is clear that counsel had such access, despite the defense paralegal's tiff with the first sergeant over a single witness' appointment. On 1 April 1992, the Shaw wing commander rescinded both the Rust and Biankini orders. At this time, the appellant could personally contact his former co-workers, apparently subject only to Major Blanchette's requirement of that he check in first with either him or another supervisor. By the appellant's own admission, he personally contacted everyone at the Shaw Contracting Office he wanted, except for two civilian employees who had no firsthand knowledge of any events in the Gulf. Regarding the allegedly poisoned atmosphere in Contracting, all witnesses agreed that neither Major Blanchette nor any other supervisor had said or done anything to send the message that someone helping the appellant would suffer harm. The two NCOs who testified they had such a concern obviously were not deterred from testifying in support of the appellant's motion to dismiss. According to the appellant's trial defense counsel, the decision to keep a low evidence profile was motivated by fear of prosecution rebuttal, and not because character witnesses were unavailable. As a matter of strategy, the appellant and his counsel chose to litigate this trial primarily by pretrial motions intended to exclude as much incriminating evidence as possible, and then to impeach the weight of that which went before the members. Appellant executed this strategy fully and fairly.

Because the appellant has failed to carry his burden of production as to the second *Levite–Stombaugh* prong, we need not reach the third part of that test—whether he produced evidence that the unlawful command influence was the proximate cause of the unfairness. Accordingly, we find beyond a reasonable doubt that, even assuming the appellant's factual allegations are true, neither the findings nor the sentence of his court-martial were tainted by unlawful command influence.

## III. APPELLANT'S STATEMENTS TO THE AFOSI

Appellant contends the military judge should have suppressed his statements to AFOSI agents on two grounds. First, he claims the agents violated his right to counsel by continuing interrogation in spite of his request for a lawyer. Second, he asserts his statements were unlawfully coerced by a combination of restraint, intimidation, threats, and promises by AFOSI and Colonel Rust.

### A. Background

Appellant was apprehended by Special Agent Pecko and other AFOSI agents on the afternoon of 6 March 1991, after a "sting" operation. This operation was designed to record the appellant on videotape accepting a gold bracelet and money—both of which having been distinctively marked by AFOSI—from a U.A.E. vendor, and apprehend the appellant with the bracelet and money in his possession. The "sting" was not an unqualified success. The videotape (with sound) shows the appellant examining a bracelet, asking what the marks (made by the AFOSI) mean, and trying it on. However, the appellant ends up giving it back to the vendor. The videotape then shows the vendor handing something to the appellant, which he puts in his pocket, but it is impossible to tell what the item is. However, a search of the appellant incident to his apprehension just outside the vendor's shop recovered the marked money from his pocket. After the apprehension, the AFOSI drove the appellant to Al Dhafra Air Base. Although the appellant was not free to go, he was not in handcuffs or similar physical restraints.

Back at Al Dhafra, Agent Pecko interrogated the appellant, with the assistance of Special Agent Bland, the rest of the afternoon and evening of 6 March 1991. Before beginning the interview, Agent Pecko advised the appellant of his rights under Article 31, UCMJ,[18] and the Fifth Amendment, including his right to consult with and have an attorney present during questioning. Appellant waived his rights and agreed to answer questions. Throughout the remainder of the 6 March questioning, the appellant denied any wrongdoing and resisted providing any meaningful information. It was during this stage of the interrogation that Colonel Rust entered the room and made the remarks described above. Before speaking to the appellant, however, Colonel Rust advised him of his Article 31/Fifth Amendment rights, which the appellant again waived. After Colonel Rust finished his remarks and left the room, Agents Pecko and Bland continued the questioning. Agent Pecko broke off the interrogation at about 2200 hours. Appellant was escorted to a private room in visiting officers' quarters, where he spent the night with a Security Policeman posted outside his door.

Agents Pecko and Bland resumed the interrogation the following morning, 7 March 1991, at about 0800. Again, Agent Pecko advised the appellant of his Article 31/Fifth Amendment rights and, again, the appellant waived them. At this point, the accounts of the appellant and his AFOSI interrogators diverge. Appellant claims that, sometime during the morning of 7 March, he asked for a lawyer. According to the appellant, Agent Pecko refused to honor the request or stop the interrogation. Appellant testified Agent Pecko told him that they did not have time for a lawyer, and offered to let him meet with Colonel Rust instead. Not surprisingly, Agent Pecko's version of these events is quite different. He testified that the appellant never requested a lawyer, but asked to see Colonel Rust on his own initiative. Agent Bland corroborates Agent Pecko's account. In any event, Agents Pecko and Bland then took the appellant to see Colonel Rust.

At Colonel Rust's office, the colonel again advised the appellant of his Article 31/Fifth Amendment rights, which the appellant again waived. Appellant asked to talk to Colonel Rust someplace else, and the colonel suggested they take a ride in his vehicle. Here again the accounts differ. According to the appellant, Colonel Rust implied during their ride that he would make everything go away if the appellant cooperated with the AFOSI. Colonel Rust testified that the appellant became emotional and was worried about his family. The colonel conceded that he urged the appellant to cooperate with the AFOSI. However, he denied promising anything in exchange for the appellant's cooperation, except fair treatment and to contact the appellant's father. After this conversation, Colonel Rust returned the appellant to the custody of Agents Pecko and Bland. Agent Pecko reminded the appellant of his rights, and resumed the questioning. Shortly after this, Special Agent Lukens replaced Agent Bland as Agent Pecko's assistant.

At this point, the appellant began offering specific information, including admissions that he had taken money from U.A.E. vendors. However, the appellant maintained he had not personally accepted bribes and kickbacks. Instead, he claimed the money was for Omar Hassan. Appellant then made a handwritten statement. Appellant alleges he merely wrote down what the AFOSI agents told him to write. According to Agent Pecko, he reminded the appellant to write on certain topics he had discussed orally, but he insisted the handwritten statement had been in the appellant's own words. Mr. Lukens (now retired from the Air Force) corroborated Agent Pecko's testimony.

When the appellant had completed his handwritten statement, the agents used it to computer-print a double-spaced draft. Appellant reviewed the draft, and made corrections and revisions. The revised draft was then printed verbatim on a standard AFOSI statement form. This form has preprinted Article 31/Fifth Amendment rights advice, and places where a suspect checks off his choices as to assertion of rights or waiver.

18. 10 U.S.C. § 831 (1988).

Agent Pecko went through these rights again with the appellant, who then checked off his choices. At this point, the testimony conflicts one more time. All agree the appellant checked off the "I want a lawyer" block, but then scratched it out and checked "I do not want a lawyer." However, the appellant said he checked "I want a lawyer" because he wanted one, and only scratched it out because Agent Pecko told him he could not have one. Agent Pecko testified the appellant checked "I want a lawyer" as a clerical mistake, orally reiterated that he did not want a lawyer, and scratched the mark out for that reason. Once again, Mr. Lukens supports Agent Pecko's version. In any case, the appellant went on to review his printed statement, sign it, and take an oath to its truth. This completed the interrogation.

At trial, the military judge denied the defense motion to suppress the appellant's oral and written statements, concluding that the appellant had voluntarily waived his right to counsel, and there was no evidence of "unlawful inducement, coercion, or unlawful influence." Adopting the factual averments in the prosecution's brief, she found that the appellant had not requested a lawyer on 7 March, but had asked to see Colonel Rust, and that the appellant's mark at the "I want a lawyer" block on his written statement had been a clerical error. In addition, the military judge found that Colonel Rust had, on 6 March 1991, been "very upset and told the accused that he was very disappointed in him and could spit in his face ... [and] also advised the accused that he was known downtown as a 'black Jew.' Further, on 7 March 1991, [Colonel Rust] advised the accused that if the accused cooperated with the OSI, he would call the accused's father and explain the situation and make sure that the accused was treated fairly." The military judge found that the "spit in your face" remark was not a threat, and did not make the accused's later statements involuntary. She also adopted the prosecution's factual averments concerning the conditions of the interrogation into her findings and, based on the totality of the circumstances, concluded the appellant's statements were voluntary.

## B. General Rules and Standards of Review.

An involuntary statement may not be admitted in evidence against an accused. Mil.R.Evid. 304(a). A statement is "involuntary" if it is obtained in violation of the Fifth Amendment or Article 31, UCMJ, or by coercion, unlawful influence, or unlawful inducement. Mil.R.Evid. 304(c)(3). When a suspect asks for a lawyer, the Fifth Amendment requires that the questioning immediately cease. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Mil.R.Evid. 305(f). Promises from superiors or law enforcement personnel are unlawful inducement, if the promises are such that the suspect's ensuing decision to speak is not a "free and unconstrained choice." *United States v. Lonetree*, 35 M.J. 396, 401 (C.M.A.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993); *United States v. Churnovic*, 22 M.J. 401, 409 (C.M.A.1986) (Cox, J., concurring). *See also United States v. Dalrymple*, 14 U.S.C.M.A. 307, 34 C.M.R. 87, 90, 1963 WL 4759 (1963). Whether an accused made such a free and unconstrained choice is determined by considering the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Lonetree*, 35 M.J. at 400.

When an accused claims an interrogation violated his rights to counsel, we review the military judge's ruling applying an abuse of discretion standard. *United States v. McLaren*, 38 M.J. 112, 115 (C.M.A.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994). However, if an accused contends his statement was the product of coercive police activity, we will review that issue *de novo*. *Fulminante*, 499 U.S. at 286–287, 111 S.Ct. at 1252–1253; *United States v. Moore*, 38 M.J. 644, 647 (A.F.C.M.R.1993). In applying either standard, we will defer to the military judge's findings of fact unless they are clearly erroneous. *United States v. French*, 38 M.J. 420, 424–425 (C.M.A.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994).

## C. Decision

■ The military judge found the appellant had not requested a lawyer at any time during his AFOSI interrogation. These findings are not clearly erroneous. We find the military judge did not abuse her discretion in denying the motion to suppress on that ground.

The military judge's factual findings concerning the alleged coercion are also not clearly erroneous, and we accept them. At first blush, these facts are a little troubling. In particular, we are concerned about the length of the interrogation and the role of Colonel Rust.

■ The length of an interrogation is an important factor in whether a statement is voluntary. *See United States v. Houston,* 15 U.S.C.M.A. 239, 35 C.M.R. 211, 217, 1965 WL 4653 (1965); *United States v. Rogers,* 14 U.S.C.M.A. 570, 34 C.M.R. 350, 374, 1964 WL 5028 (1964) (Ferguson, J., concurring in part and dissenting in part); *United States v. Tanner,* 14 U.S.C.M.A. 447, 34 C.M.R. 227, 230, 1964 WL 5002 (1964). However, lengthy questioning does not *per se* undermine the voluntariness of a statement, if the conditions of the interview otherwise show the statement was the product of free and unconstrained choice. *See United States v. Robinson,* 21 M.J. 937, 944–945 (A.F.C.M.R.1986), *aff'd,* 26 M.J. 361, 366–367 (C.M.A.1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989). In this regard, the record and the military judge's findings reflect a businesslike setting, periodic breaks for necessities and a meal, and an overnight break where the appellant had an opportunity for a full night's sleep in a comfortable room.

We are not impressed with Colonel Rust's contributions to the appellant's interrogation on 6 March 1991. The record is unclear how and why Colonel Rust ended up inside the interview room. If this was AFOSI's idea of an interrogation technique, it was a bad one. If it was Colonel Rust's notion, Agent Pecko should have put a stop to it.[19] We defer to the military judge's findings that Colonel

Rust's "spit in your face" and "black Jew" comments were not threats. Nonetheless, they unquestionably were in poor judgement and, coming from a senior officer, no doubt intimidating. We note, however, that Colonel Rust did advise the appellant of his Article 31/Fifth Amendment rights before his speech, and the appellant waived those rights. Also, Colonel Rust's involvement on 6 March was brief, and the appellant's eventual decision to provide information to AFOSI was separated by many hours, including an overnight break.

■ We view Colonel Rust's actions on 7 March 1991 in a more sympathetic light. As found by the military judge, it was the appellant who wanted to see Colonel Rust and suggested they go someplace else to talk. Colonel Rust advised the appellant of his rights before their conversation and, once again, the appellant waived his rights. As found by the military judge, the only promises Colonel Rust made to the appellant were for fair treatment and to call the appellant's father. These were innocuous promises and, by themselves, did not affect the voluntariness of the appellant's subsequent statements. *See, e.g., Rogers,* 34 C.M.R. at 363–364 (promise to check out other leads); *United States v. Askew,* 14 U.S.C.M.A. 257, 34 C.M.R. 37, 42, 1963 WL 4753 (1963) (dictum) (promise to check out ordinary lead); *United States v. St. Clair,* 19 M.J. 833 (N.M.C.M.R. 1984) (promise to contact ship's legal officer and ask if accused would be restricted). *Compare Lonetree* (promise of confidentiality was unlawful inducement); *Churnovic* (promise of no disciplinary action was unlawful inducement); *United States v. Handsome,* 21 U.S.C.M.A. 330, 45 C.M.R. 104, 1972 WL 14134 (1972) (implied promise of leniency was unlawful inducement); *Dalrymple* (promise of immunity was unlawful inducement); *Askew* (promise not to question wife raised issue of voluntariness).

■ Considering the totality of the circumstances, we agree with the military judge

---

19. This incident illustrates why we have an independent Air Force Office of Special Investigations, staffed with full-time, trained criminal investigators. When AFOSI agents discard this autonomy and allow local commanders (or other senior officers like Colonel Rust) to inject themselves into their investigations, issues such as those presented here are inevitable.

that the appellant's statements to the AFOSI were voluntary. Appellant had been fully advised of his rights, and affirmatively waived them, four times before he began his incriminating statements. In addition, he had been "reminded" of his rights another time. Before he signed and swore to his formal written statement, he was fully advised and waived his rights again. In comparison to such constant reinforcement of the appellant's rights, the length of the questioning and actions of Colonel Rust were insignificant. Moreover, the record portrays the appellant as a "cagey" operator (or at least someone who perceived himself to be so) who decided he would try to talk his way out of trouble. He willingly gave up his rights to "fence" with the AFOSI. Over the hours of questioning, the agents confronted the appellant with the evidence against him, piece by piece, to include playing the 6 March surveillance videotape. Appellant still chose to continue the duel, despite every opportunity to stop the interrogation. Eventually, the appellant decided he would acknowledge taking money from U.A.E. vendors, but without admitting he was taking it for himself. As the appellant now undoubtedly realizes, these were all unwise choices. Nonetheless, they were his free and unconstrained choices. The military judge did not err in denying the motion to suppress.

## IV. UNLAWFUL PRETRIAL PUNISHMENT

### A. Background

Many of the facts supporting the appellant's pretrial punishment claim are in our discussion of the command influence issue. *See* section II.A., *infra*. Appellant argues these actions were intended to punish him for the offenses he allegedly had committed and, in the case of Major Biankini's reassignment of him to the Correctional Custody and Transition Flight (CC & T–Flight) program, also as retaliation for revealing unfavorable information about the major to his attorneys.

The prosecution countered with testimony that neither Colonel Rust nor Major Biankini took action with punitive intent, but for legitimate command purposes. Concerning Colonel Rust's U.A.E. "no contact" order, the

stated purposes of that order were to preserve the integrity of the pending investigation and prevent an international incident in the sensitive period following the Gulf War. Regarding Major Biankini's "no contact" order, Major Blanchette testified that, considering the nature of the investigation, it was inappropriate for the appellant to continue his contracting duties, and that the appellant's contact with Contracting Office personnel was having a deleterious effect. Concerning the appellant's reassignment to CC & T–Flight, the Shaw staff judge advocate (Lt. Colonel Winborn) testified he advised Major Biankini to reassign the appellant after she informed him that the appellant had been disruptive in the orderly room. However, Lt. Colonel Winborn provided no details how the appellant had been disruptive, or why CC & T–Flight had been selected as the appellant's new duty section. Major Biankini testified by way of stipulation, and did not appear in person. Her stipulated testimony addressed primarily the chronology of events. It did not directly rebut the appellant's retaliation claim, but includes the statement that "At that time [of the appellant's reassignment from the orderly room], I did not have enough work to keep SSgt Washington busy."

The record contains no indication that, before the Article 32 investigation in March 1992, the appellant had ever formally complained about the conditions of his duties or any other aspect of Colonel Rust's or Major Biankini's orders. During oral argument of the command influence issue before this Court, the appellant's counsel conceded his client had made no such complaints.

The defense raised the issue of unlawful pretrial punishment at trial in a motion to dismiss. The military judge denied the motion, finding that:

... [the] housekeeping tasks around the base ..., while not glamorous, certainly did not rise to the level of demeaning or degrading. Nor can I fault the accused's commanders for taking him out of his work section, considering the nature of the alleged misconduct. The orders were in furtherance of the valid military purpose of

maintaining good order and discipline in the unit and to prevent obstruction of justice.

## B. General Rules and Standards of Review

In *United States v. Palmiter*, 20 M.J. 90 (C.M.A.1985), the Court of Military Appeals set out the process for evaluating alleged Article 13 violations:

[T]he question of whether particular conditions amount to punishment before trial is a matter of intent, which is determined by examining the purposes served by the restriction or condition, and whether such purposes are "reasonably related to a legitimate governmental objective." [Citation omitted].

"[I]n the absence of a showing of intent to punish, a court must look to see if a particular restriction or condition, which may on its face appear to be punishment, is instead but an incident of a legitimate nonpunitive governmental objective."

20 M.J. at 95 (quoting *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)). Therefore, we will apply a two-part test to the facts of this case:

1. Did Colonel Rust or Major Biankini intend to punish the appellant by either "no contact" order, or by the reassignment to CC & T–Flight?

2. If there was no punitive intent, did these orders and the reassignment further a legitimate nonpunitive governmental objective?

In addressing the second prong, we are also mindful that "the reasonableness of the conduct designed to secure the nonpunitive government objective must also be considered." *United States v. Cruz*, 25 M.J. 326, 331 n. 4 (C.M.A.1987). *See also Palmiter*, 20 M.J. at 99–100 (Everett, C.J., concurring).

■ The parties have spent much effort arguing the legality of Colonel Rust's and Major Biankini's "no contact" orders. It should be clear from the *Palmiter* rule that the abstract legality of these orders is not a threshold issue. If orders or other actions independently violate law or regulation, that may be a reason to infer a punitive intent or reject an asserted nonpunitive objective. *See United States v. Villamil–Perez*, 32 M.J. 341, 343 (C.M.A.1991) (posting of incident report on bulletin board violated Army regulation). However, an otherwise lawful action still violates Article 13, if it is intended as punishment or does not reasonably relate to a legitimate nonpunitive governmental objective.

■ Issues of pretrial punishment are not waived, either expressly before trial or by failure to raise them at trial. *See Cruz*, 25 M.J. at 330–331 (failure to raise); *Palmiter*, 20 M.J. at 96 (express pretrial "waiver"). However, a servicemember's failure to complain of conditions before trial is "strong evidence" that the member has not been illegally punished. *Palmiter*, 20 M.J. at 97. *See also United States v. Huffman*, 40 M.J. 225, 227 (C.M.A.1994); *United States v. James*, 28 M.J. 214, 216 n. 4 (C.M.A.1989).

■ Neither the Court of Appeals for the Armed Forces nor this Court has formally stated the standard of review for trial rulings on Article 13 issues. The government suggests our standard of review should be *de novo*. We agree. In our view, the nonwaivable nature of Article 13 violations is more consistent with a *de novo* review than with an abuse of discretion standard. *But see United States v. Phillips*, 38 M.J. 641, 642 (A.C.M.R.1993) (abuse of discretion standard applied to Article 13 ruling). As with other types of trial rulings, we will defer to the findings of fact by the military judge unless they are clearly erroneous. *United States v. Burris*, 21 M.J. 140, 144 (C.M.A.1985). However, as with unlawful command influence issues, whether unlawful pretrial punishment flows from those facts is a question of law for this Court.

## C. Decision

■ We can dispose of Colonel Rust's U.A.E. "no contact" order quickly. There is no evidence of any punitive intent. The intended purposes of the order—to avoid compromise of an ongoing investigation and a potential international incident in the aftermath of the Gulf War—were obviously legitimate nonpunitive governmental objectives.

Colonel Rust's order reasonably related to those objectives. Therefore, we find the appellant was not subjected to unlawful pretrial punishment while in the U.A.E. or Saudi Arabia.

Major Biankini's "no contact" order and the reassignment to CC & T-Flight at Shaw are another matter. There is no satisfactory explanation in the record for the order extending beyond official contact to social activity. There are no specific examples of "disruptive" acts by the appellant, or an explanation why they required his reassignment instead of appropriate discipline. The prosecution presented no evidence explaining how CC & T-Flight was selected as the appellant's new duty section, instead of another place not generally identified with punishment or where the appellant could exercise responsibilities more in line with his grade. We are especially concerned with the prosecution's failure to rebut the appellant's testimony that Major Biankini had reassigned him after learning he had passed on embarrassing information about her to his defense counsel.

■ From these facts, we infer that Major Biankini's actions were at least partially motivated by a desire to punish the appellant. We agree with the military judge that the appellant's "weeds and seeds" duties were not *per se* demeaning or degrading, but that is not the test. Under *Palmiter*, if duties are intended as punishment, then an Article 13 violation follows, even if the work is not inherently distasteful.

■ Even if we could get past the intent prong of the *Palmiter* test, we do not see the CC & T-Flight assignment as reasonably serving a legitimate nonpunitive purpose, at least without an explanation of why other duties were not available. Moreover, the record reveals no legitimate nonpunitive purpose for an order preventing all association between the appellant and his former coworkers, even in social settings.

We are mindful that, before his Article 32 investigation, the appellant never formally complained about his working conditions and the breadth of the "no contact" order. We acknowledge this is normally strong evidence

against a finding of unlawful pretrial punishment. However, we will not resolve this issue against an appellant, based solely on his failure to complain when there is a clear inference of punitive intent, or when the evidence discloses no legitimate nonpunitive purpose that is reasonably served by the pretrial conditions.

We find the appellant was subjected to pretrial punishment in violation of Article 13, UCMJ, from 10 July 1991 to 1 April 1992 (the date the Shaw wing commander rescinded the "no contact" orders). Appellant was still assigned to CC & T-Flight on 1 April 1992. However, the record shows that, by this date, the appellant's commanders had allowed him the flexibility to work more or less full time with his attorneys in preparing his defense. We conclude, therefore, that the appellant's unlawful pretrial punishment ended on 1 April 1992.

■ At trial, the appellant moved for dismissal based on this Article 13 violation. This was not the correct remedy, as unlawful pretrial punishment only affects an accused's sentence, if he is convicted. *See Cruz*, 25 M.J. at 331. Appellant now asks for sentence relief, first in the form of setting aside the sentence and ordering a rehearing, and in the alternative for a two-year credit to the appellant's confinement. We do not believe a rehearing is warranted, and will address the appropriate remedy ourselves. *See United States v. Smith*, 17 M.J. 1089, 1091 (A.F.C.M.R.1983). In our decretal paragraph, we will reduce the appellant's confinement one day for every one of the 266 days of unlawful pretrial punishment.

## V. REMAINING ISSUES AND DECISION

Appellant's remaining assignments of error are without merit. We affirm all findings of guilty. Because of the Article 13 violation, we affirm only so much of the approved sentence that extends to a bad-conduct discharge, confinement for 9 years and 99 days, forfeiture of $250 per month for 10 years, reduction to E-1, and a fine of $70,000.

The findings and sentence, as modified, are correct in law and fact. Accordingly, they are

AFFIRMED.

Senior Judge HEIMBURG and Judge PEARSON concur.